In the Matter of the Involuntary Termination of Parent–Child Relationship of A.J., A.G., J.G., J.J., A.J., T.J. and L.S., Minor Children, and Their Mother, Latasha J., and Father of L.S., Bobby S., Appellants–Respondents,

v.

**MARION COUNTY OFFICE OF FAMILY AND CHILDREN,** Appellee–Petitioner,

and

Child Advocates, Inc., Co–Appellee (Guardian ad Litem).

No. 49A02–0706–JV–459.

Court of Appeals of Indiana.

Feb. 29, 2008.

Katherine A. Cornelius, Mark Small, Marion County Public Defender Agency, Indianapolis, IN, Attorneys for Appellants.

Jessica W. Krug, Marion County Department of Child Services, Indianapolis, IN, Attorney for Appellee.

## OPINION

FRIEDLANDER, Judge.

Latasha J. (Mother) and Bobby S. (Father) appeal the termination of their parental rights in Marion Superior Court, Juvenile Division, to their respective children. Both parents challenge the sufficiency of the evidence supporting the juvenile court's judgment terminating their parental rights. Concluding that the juvenile court's judgment is supported by clear and convincing evidence, we affirm.

Mother and Father raise the following restated issues on appeal:

1. Did the MCDCS proved by clear and convincing evidence that the conditions resulting in the removal and continued placement of the children outside both Mother's and Father's care would not be remedied?;

2. Did the MCDCS proved by clear and convincing evidence that termination of Mother's parental rights to the children was in the children's best interests?; and,

3. Did the MCDCS have a satisfactory plan for the care and treatment of the children?

The facts most favorable to the judgment reveal that Mother is the biological mother of the following eight children: A.R.J., A.G., J.G., J.J., A.J., D.J., T.J., and L.S. Father is the biological father of L.S.[1] T.J., Mother's seventh child, was born on April 14, 2003. T.J. tested positive for marijuana at birth. Consequently, the MCDCS and Mother entered into an Informal Adjustment whereby Mother was to receive substance abuse counseling while the children remained in her custody.

Several months later, on September 26, 2003, the MCDCS filed a petition alleging all seven children were children in need of services (CHINS). The petition alleged they were CHINS because:

[T]heir mother and sole legal custodian ... has failed to provide them with a stable, drug-free living environment. [Mother] left her children unattended in the home of a friend without making any arrangements for their care. [Mother] made no attempts to regain care and custody of her children for the past six days. Additionally [Mother] had agreed to participate in a program of informal adjustment ... due to [T.J.] being born positive for marijuana and has failed to complete the agreed upon services to address her marijuana usage.

*Exhibit* 1 at 3. The initial hearing on the CHINS petition was held on the same day, and the court declared the children to be wards of the MCDCS with placement to continue at the Guardian's Home. However, the juvenile court also authorized relative or foster care placement. Also on September 26, Mother signed an Agreed Entry wherein Mother admitted to the specific allegations in the CHINS petition, waived the requirement of a predisposition report, as otherwise required by Indiana Code Ann. § 31–34–18 (West, PREMISE through 2007 1st Regular Sess.), and requested the court to accept the provisions of the Agreed Entry as the court's own parental participation decree.

The trial court accepted the parties' Agreed Entry, which provided that Mother, among other things, participate in the following services in order to achieve reunification with her children: (1) Complete a parenting assessment and follow all rec-

---

1. The biological fathers of the remaining children are not parties to this appeal.

ommendations therefrom, (2) participate in and successfully complete a series of age-appropriate parenting classes, (3) complete a drug and alcohol assessment and follow all recommended treatment plans, and (4) participate in home-based counseling. The MCDCS subsequently placed the children with the children's maternal grandmother (Grandmother).

Mother initially made some efforts to comply with the Agreed Entry, however, on October 9, 2004, she gave birth to her eighth child, L.S., who tested positive for marijuana. On October 13, 2004, the MCDCS, who had already removed L.S. from Mother's care, filed a petition alleging L.S. was in need of services. Mother entered an admission to the CHINS petition on the same day. The CHINS petition identified Father as the alleged father of L.S.; however the petition stated that the "alleged father of this child . . . has not successfully demonstrated to the [MCDCS] the ability or willingness to appropriately parent the child. [Father] has not yet established paternity over the child and is not her custodial parent at this time." *Exhibit* 8 at 34. Father admitted to the specific allegations of the CHINS petition and L.S. was subsequently placed with Grandmother.

Prior to L.S.'s birth, in July of 2004, Mother and four of the five alleged fathers of the seven older children signed consents so that all of the children could be adopted by Grandmother. The fifth alleged father was later found and signed a consent for adoption in 2006. Similarly, Father did not sign a consent to adopt until after L.S. was born. As a result of signing the adoption consents, the MCDCS no longer offered, and Mother no longer participated, in services. From July 2004 until February 2006, the children remained in the custody of Grandmother awaiting adoption.

On February 28, 2006, the MCDCS removed all eight children from Grandmother's custody and placed them in three different foster homes. The oldest child, A.R.J., was placed in a therapeutic residential facility. The removal of the children was due to the substantiation of abuse allegations against Grandmother, who had inadvertently left a message on the MCDCS family caseworker's voicemail where she was heard to be using harsh language to discipline the three youngest children and where she was also heard threatening to "beat their butts." *Respondent's Exhibit A, Father* at 86. After receiving the message, the family caseworker visited the children's school and spoke with four of the children who stated that Grandmother used a belt to discipline them. The family caseworker also observed marks on the children's backs in various degrees of healing that the children claimed they received from being "whooped" with a belt by Grandmother. *Id.* The children also stated that Grandmother slapped them in different locations with an open hand.

Upon learning of the children's removal from Grandmother's care and custody, Mother contacted the MCDCS and requested services. On March 30, 2006, Mother completed a parenting assessment. On May 18, 2006, the MCDCS filed a petition to terminate Mother's parental rights to all of her children. In June 2006, Mother tested positive for THC at her drug and alcohol abuse assessment. Based on this assessment, it was recommended that Mother participate in an Intensive Outpatient Drug Treatment Program (IOP) where the participant meets with a counseling group approximately three times a week, for two and a half hours at a time, for twenty-four sessions. After successful completion of the IOP phase, the participant graduates to an eight-week aftercare program where he or

she meets with the counseling group one time a week for an hour and a half.

Mother began the IOP in June 2006, but after three classes she was hospitalized for problems associated with her pancreas. Mother was subsequently discharged from the IOP due to lack of participation. Mother thereafter failed to participate in services until November 2006, when Mother contacted MCDCS caseworker Tracy Carter stating she had started services on her own and requesting a new IOP referral. Mother successfully completed the second IOP and was participating in the aftercare program at the time of the fact-finding hearing.

The fact-finding hearing on the termination petition commenced on March 14, 2007, and was continued on March 15, and April 9, 2007. At the commencement of the hearing, the MCDCS dismissed the petition as to A.R.J. because it planned to emancipate her after she completed an independent living program. On May 16, 2007, the juvenile court issued its judgment terminating the parent-child relationships between Mother, Father, and the remaining seven children. In so doing, the trial court made the following pertinent findings and conclusions:

### FINDINGS OF FACT

\* \* \*

5. [Father] is the father of [L.S.] [Father] was present for trial and represented by counsel.

\* \* \*

8. [Mother] agreed to participate in court ordered services to address her ability to appropriately care for her children. These services included completion of a parenting assessment and all recommendations therein, parenting classes, completion of a drug and alcohol assessment and all the recommendations that resulted from that assessment, drug and alcohol treatment, and home based counseling.

9. [Mother] has had since September 2003, when this agreement was signed, to complete these services, but has failed to do so.

10. [Mother] was again ordered to complete these same services under the CHINS dispositional decree and parental participation order entered when her last child, [L.S.], was born and tested positive for marijuana in October 2004. This was the second drug positive baby [Mother] delivered.

11. From September 2003 until March 2006, [Mother] did not complete a single court ordered service.

12. [Mother] completed a Parenting Assessment on March 30, 2006. As a result of that assessment, Intensive Outpatient Drug Treatment was recommended due to [Mother's] history of drug use and her positive urine screen for THC and Cocaine Metabolites on the date of the assessment. Also recommended was that [Mother] complete parenting classes, obtain appropriate housing and employment and complete home based counseling.

13. In June 2006, [Mother] tested positive for THC at her drug and alcohol [abuse] assessment at Family Services Association. Based on this assessment, [Mother] was referred for Intensive Outpatient Treatment. [Mother] failed to complete this program and was discharged due to lack of participation.

14. [Mother] is currently enrolled in another Intensive Outpatient

Treatment program with Family Services Association.

15. [Mother] has not visited with her children since the CHINS court suspended her visitation due to her noncompliance with services. The CHINS court then ordered that her visitation could be reinstated only when the children's therapists agreed that it was in their best interests. This condition has not been met and the visitation has remained suspended.

16. [Mother] has a lengthy history of drug use with only a recent display of sobriety. Given her inability to demonstrate the capacity to meet their needs on a long term and consistent basis, there is reasonable probability that the conditions that resulted in the children's removal or the reasons for placement outside her home will not be remedied. Because [Mother] did not participate in services for such a long period of time, she has not been able to progress in a timely manner which would have allowed for the referral of home based counseling.

17. [Mother's] recent participation and progress in services is insufficient, given the amount of time that has passed and the numerous opportunities that she previously had to complete services and work toward reunification.

18. [Father] ... of [L.S.] has repeatedly failed to contact [MCDCS] case managers as required under the dispositional decree entered in the CHINS court. [Father] has only completed one required service, a parenting assessment which included a drug and alcohol abuse assessment.

19. [Father's] parenting assessment was completed by Michelle Marsh from Midtown. Scheduling the appointment was difficult because of [Father's] failure to return Ms. Marsh's calls. The parenting assessment was not completed until September 21, 2006, a full three months after the first contact made by Ms. Marsh. [Father] tested positive for THC on the accompanying drug screen taken on the date of the parenting assessment. Intensive Outpatient drug treatment was recommended.

20. [Father] has failed to complete the drug counseling and has also failed to complete the other recommended services of the parenting assessment, including parenting classes, random drug screens, and home based counseling.

21. [Father]'s visitation with his child was suspended by the CHINS court and has never been reinstated due to his failure to engage in services.

22. Given [Father's] lack of participation in services, his failure to stay in contact with the case manager, and his history of drug use, there is a reasonable probability that the reasons for placement of the child outside of his home will not be remedied.

\* \* \*

30. It is in the children's best interest to terminate the parent-child relationship. The children need permanency and stability that these parents are unable to provide.

*Appellant–Mother's Brief* at 2–6.[2] The following appeal ensued.

2. Pursuant to Ind. Appellate Rule 46(A)(10), Mother properly included in her Appellant's

Mother and Father both claim that the juvenile court's judgment terminating their parental rights to their respective children is clearly erroneous. Specifically, each claim that the MCDCS failed to prove by clear and convincing evidence that the conditions resulting in removal of the children from their care would not be remedied. Mother further asserts that there was insufficient evidence to support the trial court's determination that termination of her parental rights was in the children's best interests and that the MCDCS had a satisfactory plan for the care and treatment of the children.

 This court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832 (Ind. Ct.App.2001). Thus, when reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258 (Ind.Ct.App.2004), *trans. denied.* Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the juvenile court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204 (Ind.Ct.App.1999), *trans. denied.* Thus, if the evidence and inferences support the juvenile court's decision, we must affirm. *Id.*

 Here, the trial court made specific findings and conclusions thereon in its order terminating Mother's parental rights. Where the trial court enters specific findings and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake County Office of Family & Children,* 839 N.E.2d 143 (Ind.2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.*

### 1.

 "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct.App.1996), *trans. denied.* However, the juvenile court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.,* 750 N.E.2d 832. Parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities. *Id.*

In order to terminate a parent-child relationship, the State is required to allege that:

(A) one (1) of the following exists:

 (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;

* * *

(B) there is a reasonable probability that:

 (i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or

 (ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;

Brief a copy of the juvenile court's judgment terminating her parental rights. However, the judgment was inserted at the back of Mother's Appellant's Brief and the pages of the judgment were not re-numbered in accordance with the pages of the brief. Thus, the page numbers cited to herein refer not to the pages of the Mother's Appellant's Brief, but to the pages of the judgment itself.

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

Ind.Code Ann. § 31–35–2–4(b)(2) (West, PREMISE through 2007 1st Regular Sess.). The State must establish each of these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232 (Ind. 1992).

When determining whether a reasonable probability exists that the conditions justifying a child's removal and continued placement outside the home will not be remedied, the juvenile court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509 (Ind.Ct.App.2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children. *M.M. v. Elkhart Office of Family & Children*, 733 N.E.2d 6 (Ind.Ct. App.2000).

Mother asserts that the trial court failed to consider both her ability to care for her children at the time of the termination hearing as well as significant evidence of changed conditions. In support of this contention, Mother argues that at the time of the termination hearing she had substantially complied with all court-ordered services by completing a parenting assessment and a parenting class,[3] producing clean drug screens for several months, completing her IOP and participating in the IOP aftercare program, and obtaining employment and housing. Mother admits that she failed to participate in services from July 2004 until March of 2006, but claims she failed to do so because she had signed a consent for Grandmother to adopt the children, and therefore thought services were no longer needed or available to her. Mother further asserts that once she learned that Grandmother was not going to be allowed to adopt the children, she initiated services herself and contacted the MCDCS to obtain additional referrals. Thus, Mother concludes the juvenile court's Findings Nos. 9, 11, 16, and 17, *see supra*, were not supported by the evidence because the trial court improperly charged her with the time Grandmother had custody of the children pending the adoption and failed to consider evidence of her change in circumstances.

The MCDCS counters that the children were removed because they were "subject to neglect in the care of their mother, as evidenced by her continued drug use, ina-

---

3. In its brief to this court, the MCDCS complains that Mother's evidence of completing parenting classes in the form of a certificate for completing a "Parenting of School Age Children" class was improperly admitted at trial because no proper foundation had been laid and there was no evidence of what the requirements of the class were. *Appellee's Brief* at 11. At trial, however, the MCDCS failed to preserve this issue for appeal because although it joined the GAL's attorney in objecting to the admission of Respondent–Mother's Exhibit A, which contained several documents including Mother's parenting class certificate, the attorney stated, "I don't have a particular objection about the parenting of school aged children although it is hearsay since the person who signed this is not present." *Transcript* at 267. In order to preserve for review a claim that the trial court erroneously admitted evidence, a specific and timely objection must be made. *Shady v. Shady*, 858 N.E.2d 128 (Ind.Ct.App.2006), *trans. denied*. In the absence of a specific and timely objection, a claim regarding the admission of evidence is not available on appeal unless it constituted fundamental error. *Id.* Nowhere in its brief does the MCDCS make such a claim. The issue is therefore waived.

bility to make appropriate decisions regarding the care of her children, and failure to benefit from the services offered to her by MCDCS." *Appellee's Brief* at 10. The MCDCS further states that there "is no evidence [Mother] has remedied [her drug addiction] in light of her sporadic periods of sobriety[,]" *id.* at 10–11, and that Mother's lack of commitment is further evidenced by the fact she had thirteen months to complete the necessary services after learning of the children's removal from Grandmother's care and failed to do so. Thus, the MCDCS concludes that it was proper for the trial court to believe that Mother "would not complete services this time around either, or that the length of time necessary for her to complete her services is too great." *Id.* at 12.

Mother's argument that the juvenile court improperly assessed her with the time the children were in Grandmother's custody and awaiting adoption, as reflected in findings nine and eleven, does not fall on deaf ears. Testimony from MCDCS caseworker Sandra Jude that the parents were not engaged in services toward reunification during the time period they were in Grandmother's custody because "[t]hey had signed consents … and so at that time the [plan] had changed to adoption and therefore the parents were not participating[,]" seemingly supports Mother's contention. *Transcript* at 56. Jude also admitted that she did not make any service referrals for Father because "the plan was adoption and the parents had signed specific consents." *Id.* at 60.

Assuming without deciding that the juvenile court's Findings Nos. 9 and 11 are not supported by the evidence, a careful review of the record reveals that the court's judgment is nevertheless supported by numerous other findings which substantiate its determination that the reason for removal and continued placement of the children outside Mother's care would not be remedied. Thus, Findings Nos. 9 and 11, even if erroneous, cannot serve as a basis for reversible error. *See Lasater v. Lasater,* 809 N.E.2d 380 (Ind.Ct.App.2004) (concluding that to the extent a judgment is based on erroneous findings, those findings are superfluous and are not fatal to the judgment if the remaining valid findings and conclusions support the judgment).

Although we recognize and applaud Mother's recent efforts in combating her drug addiction, the evidence most favorable to the judgment indicates that Mother had approximately thirteen months from the time she learned of the children's removal from Grandmother in February 2006, until the final termination hearing in April 2007, to complete services. Unfortunately, during this time, Mother not only tested positive for THC during her drug and alcohol assessment, but was discharged from her first attempt at IOP for lack of participation in June 2006, and did not re-initiate services until November 2006, thereby delaying her treatment by many months.

The record also reveals that the children were originally removed from Mother in 2003 because Mother had failed to provide the children with a stable, drug-free living environment. At the time of the final hearing on the termination petition in April 2007, notwithstanding Mother's recent progress in combating her drug addiction, Mother still had to complete seven weeks with the IOP aftercare program, as well as complete home-based counseling, which could not even begin unless or until Mother successfully completed the IOP. Based on the foregoing, we conclude that the court's Findings Nos. 16 and 17, which found that Mother had a lengthy history of drug use with only a recent display of sobriety and that Mother's recent partic-

ipation and progress in services was insufficient given the amount of time that had passed and Mother's numerous opportunities to complete services, were supported by the evidence.

As stated previously, although a juvenile court must judge a parent's fitness to care for his or her children at the time of the termination hearing, the court *must also evaluate the parent's habitual patterns of conduct* to determine the probability of future neglect or deprivation of the child. *See In re D.D.*, 804 N.E.2d 258. Here, the juvenile court had the ultimate responsibility of judging Mother's credibility and of weighing her testimony of changed conditions against the evidence demonstrating her habitual patterns of conduct in failing to remain drug-free. It is clear from its findings that the juvenile court considered the former, but gave more weight to evidence of the latter. Additionally, the MCDCS is not required to rule out all possibilities of change; rather, it need establish "only that there is a reasonable probability that the parent's behavior will not change." *In re Kay. L.*, 867 N.E.2d 236, 242 (Ind.Ct.App.2007).

We reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Matter of A.N.J.*, 690 N.E.2d 716, 722 (Ind.Ct.App.1997) (quoting *In re Egly*, 592 N.E.2d at 1235). Based on the foregoing, we cannot conclude that the juvenile court's judgment was clearly erroneous. *See In re L.V.N.*, 799 N.E.2d 63 (Ind.Ct.App.2003) (concluding that mother's arguments that the conditions had changed and that she was now drug free constituted an invitation to reweigh the evidence); *see also Bergman v. Knox County Office of Family & Children*, 750 N.E.2d 809 (Ind.Ct.App.2001) (concluding it was clear that the trial court gave more weight to the abundant evidence of mother's pattern of neglectful conduct towards her children during the several years prior to the termination hearing than mother's evidence that she had changed her life to better accommodate the children's needs).

Next, we address Father' assertion that the juvenile court failed to prove by clear and convincing evidence that the conditions resulting in the removal and continued placement of L.S. outside his care and custody would not be remedied. Specifically, Father argues that because he did not have custody of L.S. at the time of her removal from Mother's care and custody, he should not be held responsible for the removal.

While it is true that Father did not have custody of L.S. at the time of her removal from the family home, the CHINS petition alleged, and Father admitted, that L.S. was removed from Father because he "ha[d] not successfully demonstrated to the [MCDCS] the ability or willingness to appropriately parent the child[,]" and because he had not established paternity of L.S. *Petitioner's Exhibit* 8 at 34.

The evidence most favorable to the judgment reveals that as of the date of the final hearing on the termination petition, Father still had not shown a willingness or ability to appropriately care for L.S. A thorough review of the record reveals that although Father admitted paternity of L.S., he failed to legally establish paternity of his daughter. Additionally, at the time of the hearing, Father had failed to maintain regular contact with the MCDCS caseworkers, had failed to participate in any parenting classes, and had failed to pay any of the court-ordered support for L.S. during the entirety of the case. Father had also failed to participate in any of the court-ordered drug treatment services, including an IOP drug treatment program,

drug counseling and random drug screens. Additionally, Michael Marsh, clinical social worker at Midtown Community Mental Health Center, testified that he administered Father's parenting assessment and that during the assessment, Father admitted to having used marijuana for approximately seventeen years. Father also told Marsh that he had participated in drug treatment programs in the past and that he had stayed clean for about six months and then started using marijuana again. This evidence supports the juvenile court's finding no. 22 which stated, "Given [Father's] lack of participation in services, his failure to stay in contact with the case manager, and his history of drug use, there is a reasonable probability that the reasons for placement of the child outside of his home will not be remedied." *Appellant–Father's Brief* at 25.

 A juvenile court may properly consider the services offered by the department of child services, and the parent's response to those services as evidence of whether conditions will be remedied. *A.F. v. Marion County Office of Family & Children,* 762 N.E.2d 1244 (Ind.Ct.App.2002), *trans. denied.* Additionally, in evaluating a parent's habitual pattern of conduct, courts have properly considered, among other things, evidence of a parent's prior drug and alcohol abuse, history of neglect, and failure to provide financial support. *Id.* The juvenile court's determination that the reasons for L.S.'s removal and continued placement outside Fathers care would not be remedied is clearly supported by the evidence. Accordingly, we find no error.[4]

**2.**

 Next, Mother argues the trial court erred when it determined that termination of her parental rights is in the children's best interests. In support of this argument, Mother appears to suggest in her brief that because she continued to visit with her children while they were in Grandmother's custody, albeit against court orders to do so, "the trauma of removal could not have hit [the children] until [their] removal from their grandmother's care[,]" and therefore the MCDCS's "concern about the length of time the children had not had official visits with their mother was ungrounded." *Appellant–Mother's Brief* at 20–21. The MCDCS counters that the testimony of the children's guardian ad litem (GAL) and the MCDCS case manager regarding the children's need for permanency and their attachments to the foster parents, coupled with Mother's refusal to participate in and benefit from services clearly demonstrates that termination is in the children's best interests.

 In determining what is in the best interests of the children, the court is required to look beyond the factors identified by the Department of Child Services and look to the totality of the evidence. *McBride v. Monroe County Office of Family & Children,* 798 N.E.2d 185 (Ind.Ct. App.2003). The purpose of terminating parental rights is not to punish the parents but to protect the children involved. *In re K.S.,* 750 N.E.2d 832. The juvenile court must therefore subordinate the interests of

---

4. Having determined that the juvenile court's conclusions regarding the remedy of conditions are not clearly erroneous, we need not address whether the MCDCS proved by clear and convincing evidence that the continuation of the parent-child relationships between Mother, Father, and their respective children poses a threat to the children's well-being. *See L.V.N.,* 799 N.E.2d 63 (I.C. § 31–35–2–4(b)(2)(B) is written in the disjunctive and therefore requires the trial court to find only one of the two requirements of subparagraph (B) by clear and convincing evidence).

the parents to those of the children when determining the best interests of the children. *McBride v. Monroe County Office of Family & Children,* 798 N.E.2d 185. Additionally, the trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.*

The juvenile court's sole finding pertaining to the best interests of the children, finding no. 30, stated that the children need permanency and stability that the parents were unable to provide. The record reveals that this finding was supported by testimony from both the children's GAL and the current MCDCS caseworker. The GAL testified that when making a recommendation to the court regarding an appropriate permanency plan for the children, she takes several factors into consideration, including whether the home seems appropriate for the child in terms of number of rooms and cleanliness, whether the children's needs are being taken care of, whether the parents or foster parents are engaged in the care of the children, how the children are performing in school, whether the foster parents want the children, as well as the efforts made by the biological parents in completing services so that reunification can occur. When specifically questioned why she recommended termination of parental rights in the present case, the GAL responded, "I think the behavior problems, as well as some of the other problems would be rectified if there was a permanency with these children. They need to be somewhere they know they are going to stay, feel comfortable ... and hopefully move forward...." *Transcript* at 151. The GAL went on to explain that termination of Mother's and Father's parental rights should occur because "the parents have not been engaged with the children, haven't been visiting them, haven't moved forward on reunification over this long period of time. My issue is with the length of time that has passed...." *Id.* at 152. Similarly, family caseworker Carter also testified that termination was in the children's best interests because the children needed a permanent home. Carter went on to explain that the children needed "stability" and a "forever family" testifying that the children had "waited a long time in hopes of [the] parents to do services or for some form of reunification and that hasn't happened yet therefore I feel it is in their best interests to ... stay in these [foster] homes." *Id.* at 111. Both Carter and the GAL also testified that they had visited the children in their pre-adoptive foster homes and that the children were doing well, and that the foster parents were committed to adoption, were engaged in the children's lives, and were addressing the children's emotional needs.

Although Mother may have established that she has a sincere desire to be reunited with her children, the caseworker's and the GAL's testimony support the trial court's finding that termination of Mother's parental rights is in the children's best interests. *See McBride v. Monroe County Office of Family & Children,* 798 N.E.2d 185 (stating that the testimony of a child's caseworker and guardian ad litem regarding the child's need for permanency supports a finding that termination is in the child's best interests); *In re Campbell,* 534 N.E.2d 273 (Ind.Ct.App.1989) (holding that recommendations of the welfare caseworker and GAL that parental rights should be terminated support a finding that termination is in the child's best interests). These recommendations, coupled with the evidence of Mother's extensive drug history, her incompletion of court-ordered services, and testimony that the children were happy and doing well in their pre-adoptive foster homes is sufficient to support the juvenile court's determination that termi-

nation of Mother's parental rights is in the children's best interests.

### 3.

■ Mother's final contention is that the MCDCS failed to prove they had a satisfactory plan for the care and treatment of the children. In particular, Mother claims that the children "would be in three different homes and there was no evidence reunification with [Mother] would be harmful." *Appellant–Mother's Brief* at 23.

■ As stated earlier, in order for the juvenile court to terminate a parent-child relationship, the trial court must find that there is a satisfactory plan for the care and treatment of the child. I.C. § 31–35–2–4(b)(2)(D). This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *In re D.D.*, 804 N.E.2d 258.

At the termination hearing, Carter testified that the plan for the care and treatment of the children is adoption. She further testified that all seven children are currently in pre-adoptive foster homes and are doing well. The three older boys, A.G., J.G., and A.J. were placed in a pre-adoptive home together. J.J., who was placed in a separate home because she was struggling with some of her siblings, is doing "very well[,]" as .are the three youngest children, D.J., T.J., and L.S., who were placed together in a third pre-adoptive foster home. *Transcript* at 101. In light of this evidence, we cannot conclude that the plan set forth by the MCDCS for the adoption of the children, albeit in different homes, is unsatisfactory. *See Castro v. State Office of Family & Children*, 842 N.E.2d 367 (Ind.Ct.App.2006) (observing that adoption is generally a satisfactory plan for the care and treatment of children after termination of parental rights), *trans. denied.*

While there is abundant evidence supporting the trial court's termination of Father's parental rights to L.S., the case in favor of terminating Mother's parental rights is less compelling. Substantial evidence was introduced indicating that, as of the final termination hearing on the termination petition, Mother had made significant progress in dealing with her substance abuse problem and appeared to have a genuine desire to maintain a relationship with her children. We also recognize, however, the legitimate and substantial concerns of the MCDCS regarding Mother's failure to timely complete court-ordered services coupled with her significant history of substance abuse, and the danger such a problem poses to the children.

Ever mindful of the significance of the rights being affected and the already great duration of the case, perhaps the more prudent course would have been to continue the case for an additional seven weeks in order to establish whether Mother, in fact, completed the IOP program and remained drug free. Nevertheless, this court may not reweigh the evidence or judge the credibility of witnesses, but must decide only if the juvenile court's judgment is clearly erroneous, that is, if it is unsupported by any evidence or inference thereon. Based on the record before us, we cannot say that the trial court's termination of Mother's and Father's parental rights to their respective children was clearly erroneous. We therefore affirm the juvenile court's judgment terminating both Mother's and Father's parental rights to their respective children.

Judgment affirmed.

ROBB, J., and KIRSCH, J., concur.