**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jan 17 2012, 8:47 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ERIN L. BERGER**
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**MARY JANE HUMPHREY**
Indiana Department of Child Services
Evansville, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE INVOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF D.C. AND J.C., minor children, | ) ) ) ) | |
| and, | ) ) | |
| J.D.C., mother | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 82A01-1105-JT-225 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

**January 17, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BARNES, Judge**

### Case Summary

J.D.C. ("Mother") appeals the order terminating her parental rights to her children D.C. and J.C. We affirm.

### Issues

The issues before us are:

    I.    whether the trial court abused its discretion in denying Mother's motion for a continuance; and

    II.    whether there is sufficient evidence to support the termination of Mother's parental rights.

### Facts

D.C. was born in June 2007. In July 2008, Mother tested positive for cocaine use following a hair sample test taken as part of children in need of services (CHINS) proceedings for two of Mother's other, older children. In August 2008, Mother tested positive for valium and Lortab, for which she did not have prescriptions. At the request of the Vanderburgh County office of the Department of Child Services ("DCS"), D.C. was thereafter adjudicated a CHINS but left in Mother's care.

2

J.C. was born in February 2009. She has a serious genetic deformity of the skull called craniosynostosis that will require numerous surgeries throughout her lifetime.[1] J.C. was declared a CHINS in March 2009 due to her failure to gain weight after birth but was left in Mother's care.

Mother often failed to cooperate with DCS or participate in the services it offered while the children were in her care. She did not adequately participate in substance abuse treatment and did not cooperate with a public health nurse assigned to her case. She would advise D.C. not to say anything to DCS caseworkers. She permitted a man to live in her home, but he refused to have a background check performed on him as required by DCS, which violated DCS's safety plan for the children. As it turned out, this man was not only a convicted sex offender, but also J.C.'s father.

In April 2009, D.C. and J.C. were removed from Mother's care because of her repeated non-cooperation with DCS. The children originally were placed in a foster home but spent most of approximately two months in the summer of 2009 living with Mother's mother ("Grandmother"). However, Grandmother voluntarily relinquished care of the children in August 2009, claiming she was unable to take care of them, in part because of having to deal with Mother's problems. The children have lived together in foster care since that time. Mother has expressed a wish that Grandmother adopt the children, and at one point was willing to voluntarily terminate her parental rights to accomplish that adoption, but DCS was opposed to Grandmother adopting the children.

_____

[1] A surgeon who has treated J.C. was unable to say that Mother's drug use caused or contributed to this

3

Also, the children spent a week living with Mother in June 2009 on a trial basis. However, the children were removed from the home after Mother was arrested for battering J.C.'s father in front of the children.

After the children were removed from Mother's care, she had infrequent contact with DCS caseworkers. In fact, Mother had no contact with the caseworker assigned to her after April 2010. Additionally, Mother's visitation with the children ended by March 2010.

In May 2010, J.C. underwent major surgery. The surgeon who performed the operation noted that he had very little contact with either Mother or Grandmother regarding the surgery, which he considered very unusual, even compared to other cases in which a child was in foster care. J.C.'s foster parents successfully performed all the necessary and complicated aftercare for her, and the surgeon doubted that either Mother or Grandmother could coordinate the complex care that J.C. needed. As for D.C., he initially was non-communicative and highly aggressive when he first went into foster care, but those problems have since been substantially lessened.

In October 2010, Mother was charged with Class B felony manufacturing of methamphetamine. She apparently had created a meth lab in her apartment, which led to her being evicted. Mother was jailed as a result of this arrest, and she did not immediately bond out of jail. Mother also has a 2003 conviction for Class C felony battery with a deadly weapon, a 2009 conviction for Class D felony domestic battery, and 2010 convictions for Class B misdemeanor public intoxication and disorderly conduct, which were violations of

condition.

her probation for the domestic violence conviction. Mother also has been medically diagnosed with general anxiety disorder and opioid abuse.

The DCS filed a petition to terminate Mother's parental rights to D.C. and J.C. in July 2010.[2] The trial court conducted a hearing on the matter on November 29-30, 2010. Mother was still in jail at the time of this hearing, awaiting trial on the methamphetamine charge. She invoked her Fifth Amendment right against self-incrimination at the hearing and did not present any evidence on her own behalf. The trial court did not immediately rule on the petition at the conclusion of the hearing, and it gave each party the opportunity to submit proposed findings.

On December 30, 2010, before either party submitted their proposed findings, Mother filed a "Motion to Reopen Case to Consider New Evidence." Appellant's App. p. 26. In the motion, Mother stated that she "has worked out a deal in her criminal case whereby her cooperation will entitle her to a plea agreement to a lesser included offense and a sentence of probation." Id. The motion also sought to have the trial court take judicial notice that Mother was no longer incarcerated and to grant her a continuance "to allow the Mother to participate in services and be reunited with her children . . . ." Id.

The trial court conducted a brief hearing on this motion on February 2, 2011. Mother did not present any evidence of her plea agreement or that it had even yet been accepted by the court trying the criminal case. The trial court did take judicial notice that Mother had bonded out of jail but did not grant a continuance or any other relief. Additionally, it appears

---

[2] Mother has a total of five children. Her parental rights to her three oldest children have already been

5

that between the date of the termination hearing and this hearing, the foster parents filed a petition to adopt J.C. and D.C., and Grandmother had done so as well.

On April 13, 2011, the trial court entered its order terminating Mother's parental rights to J.C. and D.C. Mother now appeals.

**Analysis**

*I. Continuance*

Mother first argues that the trial court erred in denying her continuance motion. We review the denial of a continuance motion for an abuse of discretion. Rowlett v. Vanderburgh County Office of Family and Children, 841 N.E.2d 615, 619 (Ind. Ct. App. 2006), trans. denied. An abuse of discretion in the denial of a motion for a continuance may occur if the moving party has shown good cause for granting the motion. Id. No abuse of discretion will be found if the moving party has not demonstrated that he or she was prejudiced by the denial. Id.

The denial of a continuance motion in the context of a termination of parental rights proceeding also carries constitutional due process implications. See In re C.C., 788 N.E.2d 847, 852 (Ind. Ct. App. 2007), trans. denied. The process due in a termination of parental rights proceeding turns on the balancing of three factors: (1) the private interests affected by the proceeding, (2) the risk of error created by the State's chosen procedure, and (3) the countervailing governmental interest supporting use of the challenged procedure. Id. Both the private interests and the countervailing government interests that are affected by a

_____

terminated, apparently voluntarily.

termination proceeding are substantial. Id. The right to raise one's child is an essential, basic right that is more precious than property rights, and a parent has a commanding interest in the accuracy and justice of a termination decision. Id. On the other hand, the State's interest in protecting the welfare of a child also is significant. Id. Delays in the adjudication of a termination proceeding impose significant costs upon the functions of government as well as an intangible cost to the life of the child involved. Id. Although continuances may be necessary to ensure the protection of a parent's due process rights, "courts must also be cognizant of the strain these delays place upon a child." Id. at 853.

Mother relies heavily upon Rowlett, where we reversed the trial court's denial of a parent's continuance motion in a termination proceeding. In Rowlett, a father was arrested, convicted, and incarcerated shortly after CHINS proceedings were initiated as to his two children. Eventually, a hearing to determine whether father's parental rights should be terminated was scheduled for approximately two-and-a-half years after he had been incarcerated and about six weeks before he was scheduled to be released. Father moved to continue the termination hearing until after he had been released from prison and given the opportunity to participate in services for possible reunification with his children. The trial court denied the continuance motion and proceeded to terminate father's parental rights.

We reversed, holding that the father should have been given "a sufficient period following his release to demonstrate his willingness and ability to assume parental duties." Rowlett, 841 N.E.2d at 620. We noted that although the father's incarceration was his own doing, he had never had the opportunity to participate in services or to demonstrate his fitness

as a parent. Id. at 619. Additionally, while incarcerated, the father "participated in numerous services and programs, although offered by the correctional facility and not the OFC, which would be helpful to him in reaching his goal of reunification with his children." Id. Finally, we noted that the OFC's permanency plan for the children was their adoption by their maternal grandmother, where they had already been living during the CHINS proceedings; thus, "continuation of the dispositional hearing until sometime after Father was released would have had little immediate effect upon the children." Id.

This case is readily distinguishable from Rowlett.[3] Most notably, Mother was not incarcerated for the majority of the CHINS proceedings. Nevertheless, she was uncooperative with DCS's efforts to address her parenting skills and substance abuse issues when she was not incarcerated. She had no contact with DCS or her children at all after April 2010, even though she was not incarcerated for her latest criminal charge until October 2010. She displayed little involvement or concern in J.C.'s major surgery that she underwent in May 2010. After the children were removed from her care, she was convicted of or charged with several crimes, including the manufacturing of methamphetamine in her apartment, leading to her eviction. Also, Mother was unable to provide the trial court with proof that, in fact, she had entered into an accepted plea agreement that would permit her to serve no prison time on the methamphetamine charge.

---

[3] Mother also relies upon In re A.J., 881 N.E.2d 706, 719 (Ind. Ct. App. 2008), trans. denied, where we observed with respect to a parent who was in the midst of an intensive substance abuse program when the termination hearing was held that "perhaps the more prudent course would have been to continue the case . . . in order to establish whether Mother, in fact, completed the . . . program and remained drug free." However, despite this observation we ultimately affirmed the termination of the mother's parental rights.

8

In sum, unlike the father in Rowlett who was incarcerated for almost the entirety of the CHINS proceedings, Mother had ample opportunity to demonstrate her parenting skills and her willingness to address the issues that had led to her children being CHINS but failed to take advantage of that opportunity. There are time limits to CHINS actions, spurred by federal law, which are intended "to ensure that children did not spend long periods of their childhoods in foster care or other settings designed to be temporary." Phelps v. Sybinsky, 736 N.E.2d 809, 813 (Ind. Ct. App. 2000), trans. denied. Under the circumstances, we cannot say the trial court abused its discretion in declining to give Mother yet another opportunity or more time to demonstrate that she could become an adequate parent, which would have further delayed resolution of establishing a permanent home for D.C. and J.C.

## II. Sufficiency of the Evidence

Mother also contends that there is insufficient evidence to support the termination of her parental rights. "When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility." In re I.A., 934 N.E.2d 1127, 1132 (Ind. 2010). We consider only the evidence and reasonable inferences most favorable to the judgment. Id. "We must also give 'due regard' to the trial court's unique opportunity to judge the credibility of the witnesses." Id. (quoting Indiana Trial Rule 52(A)). Where a trial court enters findings of fact and conclusions thereon, as the trial court did here, we apply a two-tiered standard of review. Id. "First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." Id. We will set aside the trial court's judgment only if it is clearly erroneous, which occurs if the findings

9

do not support the trial court's conclusions or the conclusions do not support the judgment.

Id.

A petition to terminate a parent-child relationship must allege:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of
the child.

Ind. Code § 31-35-2-4(b)(2). DCS has the burden of proving these allegations by clear and convincing evidence. I.A., 934 N.E.2d at 1133.

Mother contends there is insufficient evidence that the conditions that resulted in the children's removal from her care would not remedied, or that continuation of the parent-child relationship poses a threat to the well-being of the children. Referring to a prior version of Indiana Code Section 31-35-2-4(b)(2)(B), our supreme court observed that the statute was written in the disjunctive, requiring DCS to prove only one of the requirements of subsection (B). Id. Although the statute has been amended, it specifically requires allegations of only one of the three factors. See I.C. § 31-35-2-4(b)(2)(B)(i)-(iii). Thus, even though Mother argues DCS failed to prove two of the factors, we only need to address whether DCS proved that the conditions resulting in the children's removal will not be remedied. See Bester v. Lake County Office of Family and Children, 839 N.E.2d 143, 148 n.5 (Ind. 2005) (observing that under the prior version of the statute DCS was required to prove either of the two factors, not both).

D.C. originally was declared a CHINS because of Mother's drug use, while J.C., a special needs child, was declared a CHINS because of her failure to gain sufficient weight. The children were not removed from Mother's care immediately, but only after she refused to cooperate with DCS's efforts to resolve the issues that had led to the children being named CHINS. When deciding whether there is a reasonable probability that the conditions leading to a child's removal will not be remedied, a trial court must judge a parent's fitness to care

11

for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions.  In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The court may also consider the parent's habitual patterns of conduct, as well as evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.  McBride v. Monroe County Office of Family and Children, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).  Additionally, the court may consider any services offered by the DCS to the parent and the parent's response to those services.  Id.  "Finally, we must be ever mindful that parental rights, while constitutionally protected, are not absolute and must be subordinated to the best interests of the child when evaluating the circumstances surrounding termination."  Id.

Here, there is ample evidence in the record, reflected in the trial court's findings, that the reasons for the children's removal from her care will not be remedied.  In part, Mother alleges that there was "simply no indication" that her illegal drug use was continuing at the time of the termination hearing, as the only evidence of positive drug screen tests on record date from the summer of 2008.  Appellant's Br. p. 10.  However, Mother was arrested in October 2010 and charged with Class B felony manufacturing methamphetamine in her apartment, one month before the termination hearing.  Mother has never denied the veracity of that allegation; in fact, in asking the trial court to find that she intended to plead guilty to a lesser included offense for that charge, she has admitted that there is at least some truth to it.[4]

---

[4] In the context of a civil case, the Fifth Amendment privilege against self-incrimination does not prohibit a court from drawing adverse inferences from a witness' refusal to testify.  Gash v. Kohm, 476 N.E.2d 910, 913 (Ind. Ct. App. 1985), trans. denied.

This evidence leads to a reasonable inference that Mother's problems with illegal drugs were continuing, more than two years after the positive drug screens from the summer of 2008 that led to D.C. being declared a CHINS.

Mother also contends that it was improper for the trial court to find that she "has little or no bond to these children." App. p. 31. We believe that finding is adequately supported by reasonable inferences from the evidence, even if there was no direct testimony that the children had little to no bond with Mother. J.C. had lived only very briefly with Mother before she was removed from her home. D.C. likewise has spent much of his life in foster care. Moreover, there was evidence that Mother had had no visitation with the children after approximately February 2010, and in fact had not even contacted the DCS caseworker since April 2010 to check on the welfare of her children. She had little to no involvement in J.C.'s major surgery in May 2010, with the foster parents providing all of the necessary care for her. The trial court's finding of little to no bond between Mother and the children is not clearly erroneous.

Assessing the remainder of the evidence, there is ample indication that Mother did little to nothing to cooperate with DCS from the time D.C. was declared a CHINS in 2008 until the time of the termination hearing in November 2010. She did not participate in substance abuse counseling. She did not maintain contact with caseworkers and others assigned to assist her. She committed several crimes, one of which led to eviction from her residence. She apparently lost any interest in keeping track of her children's welfare, which is particularly disturbing with respect to a special needs child such as J.C.

13

Mother seems to claim that a primary reason for her non-compliance with DCS was her hope and belief that Grandmother could adopt the children, and that she would consent to that adoption. We find that to be an insufficient rationale for being non-compliant. Whether or not there is the potential for relative adoption, a parent's refusal to cooperate in DCS's efforts in a CHINS case reflects a lack of concern for the children. Children are not items to be pawned off. Furthermore, Mother should have been on notice that adoption by Grandmother might not feasible as of August 2009, when Grandmother voluntarily relinquished custody of the children because of her inability to care for them. Despite this, Mother continued being uncooperative with DCS, continued committing crimes, and displayed little to no interest in the children's welfare. The trial court's conclusion that the conditions that led to the children's removal from Mother's care would not be remedied is not clearly erroneous.

## Conclusion

The trial court did not abuse its discretion in denying Mother's motion for a continuance, and its decision to terminate Mother's parental rights is supported by sufficient evidence. We affirm.

Affirmed.

KIRSCH, J., and BRADFORD, J., concur.

14