**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 07 2014, 9:31 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARIANNE WOOLBERT**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
**ROBERT J. HENKE**
**CHRISTINE REDELMAN**
Office of the Indiana Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: J.S. (minor child); <br><br> N.W. (Mother) <br><br> Appellant-Respondent, <br><br> vs. <br><br> THE INDIANA DEPARTMENT OF CHILD SERVICES, <br><br> Appellee-Petitioner. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> No. 48A02-1309-JT-778 |

APPEAL FROM THE MADISON CIRCUIT COURT
The Honorable G. George Pancol, Judge
Cause No. 48C02-1211-JT-44

**July 7, 2014**

**PYLE, Judge**

STATEMENT OF THE CASE

N.W. ("Mother") appeals the involuntary termination of her parental rights to her son, J.S.

We affirm.

ISSUE

Whether the Department of Child Services ("DCS") presented clear and convincing evidence supporting the termination of Mother's parental rights.

FACTS[1]

J.S. was born on October 27, 2005.  On July 26, 2011, DCS received a report that the home where Mother and J.S. resided contained an active methamphetamine lab.  A DCS worker arrived, and an officer told the DCS worker that the methamphetamine lab was located in a room directly above J.S.'s bedroom.  Upon entering J.S.'s bedroom, the DCS worker observed trash, soiled clothes, cigarette butts, and cockroaches covering the floor.  J.S.'s grandmother, a double-leg amputee, was found in a room covered in her own feces and urine.  She and J.S. were transported to a hospital.  At the hospital, J.S. revealed that he knew people in the home drank alcohol and used drugs, that he often had cockroaches crawling on him at night, and that all he had eaten that day were a pop tart and

---

[1] Mother's Statement of Facts in her brief only contained the reasons for J.S.'s removal and the procedural history after the petition for termination of parental rights was filed.  We direct Mother's attention to Indiana Appellate Rule 46(A)(6) requiring, among other things, a full statement of facts relevant to the issues for review, in narrative form, and in accordance with the standard of review appropriate to the judgment being appealed.

a honey bun. The DCS worker noted that J.S. was visibly dirty, having dirt on his face, torso, and hands. Law enforcement officers arrested the remaining adults in the home, including Mother, for the methamphetamine activity taking place. DCS took J.S. into custody. The same day, the State charged Mother with neglect of a dependent and possession of a controlled substance, both Class D felonies. The next day on July 27, 2011, DCS filed a verified petition alleging that J.S. was a child in need of services ("CHINS"). The court held a detention hearing on the same day and found J.S. to be a CHINS. The court set the matter for a dispositional hearing on August 24, 2011.

At the dispositional hearing, the juvenile court ordered that J.S. remain in foster placement. The court ordered Mother to participate in supervised visits with J.S., obtain and maintain appropriate housing and income, submit to random drug screens, complete a substance abuse and psychological evaluation, complete a parenting assessment, participate in individual counseling, and establish paternity for J.S. The juvenile court also ordered Mother to follow the recommendations of all service providers.

DCS filed its first progress report on February 10, 2012, covering a period beginning on July 26, 2011. Mother completed her substance abuse and psychiatric assessments with Aspire in August of 2011. Mother was referred to the Conquer Addictions substance abuse program. She attended classes for one month before stopping treatment. Between the dispositional hearing and Mother's arrest, she tested positive three times for methamphetamine. Mother was incarcerated at the time of the report and had been since December 25, 2011. After posting a surety bond for her initial arrest, she failed to appear

for her final pretrial conference, and the court issued a warrant for her arrest. Mother consistently visited J.S. until her incarceration.

DCS filed its next report on or about August 8, 2012, covering the time period of February 22, 2012 to August 22, 2012. On March 12, 2012, Mother pled guilty to neglect of a dependent child and possession of a controlled substance. The trial court sentenced Mother to three (3) years on each count to be served concurrently. The trial court suspended the sentence and placed Mother on probation. On May 23, 2012, the probation department filed a Notice of Violation of Probation with the court. A hearing was held on June 4, 2012, and Mother admitted that she violated probation by failing a drug screen. The trial court revoked her probation and ordered that she serve her suspended sentence in the Department of Correction. DCS terminated Mother's services due to noncompliance. Regarding J.S., DCS reported that he exhibited troubling behavior at school. His school reported that he experienced mood changes and intense anger and was punching and kicking his teacher. The juvenile court ordered that the permanency plan remain as reunification and set the case for another review hearing.

DCS filed its final progress report on February 22, 2013, which covered a period of review beginning on August 22, 2012. DCS reported that J.S.'s behavior had improved vastly from the previous progress report. J.S. was thriving in a new school and displayed only minor behavior problems that were not out of the ordinary for a kindergartner. J.S. also began calling his foster parent "mom." Mother had no visitation with the child while she was incarcerated. DCS filed a verified petition to terminate Mother's parental rights on November 30, 2012, and the juvenile court scheduled a fact-finding hearing for the

4

following March. However, Mother was released from prison on February 15, 2013 and she requested a continuance so that she could continue services. The juvenile court granted Mother's request and continued the fact-finding hearing until July 16, 2013.

At the fact-finding hearing, J.S.'s foster mother testified that when J.S. first came to her home he was angry, frail, and did not eat a lot. J.S. had no daily schedule; he would stay up all night and want to sleep during the day. Educationally, foster mother stated that he was below normal and had difficulty following instructions. She further stated that after visits with Mother stopped, J.S. "was thriving" and did not "seem to have any difficulty adjusting without seeing her." (Tr. 14). Foster mother stated that her intention was to adopt J.S. if Mother's parental rights were terminated.

Jill Woverton ("Woverton"), a teacher at Pendelton Elementary School, had J.S. as a student. She stated that J.S., at five years old, did not have any of the skills a child needed to be ready for school such as knowing the difference between numbers and letters, counting to ten or twenty, or knowing the letters in his name. J.S. threw tantrums in her class and would often punch or kick Woverton.

The court-appointed special advocate, Nellie Elsten ("CASA Elsten") testified about the initial reasons for J.S.'s removal and her observations that J.S. was an angry and unpleasant little boy. When CASA Elsten first became involved in the case, J.S. paid little attention to her and would scream at her and foster mother to "shut up so he could play his game." (Tr. 67). As J.S. progressed with recommended services geared toward his behavior, CASA Elsten stated that J.S.'s behavior changed tremendously. J.S. became more affectionate and personable. CASA Elsten testified that termination of Mother's

5

parental rights was in J.S.'s best interests because he had to "relearn a whole lot of life skills" that a boy his age should have known. (Tr. 68). CASA Elsten further stated that even had Mother complied with the recommended services for substance abuse and mental health treatment, she would not recommend that J.S. return to any of the residences Mother obtained during the CHINS proceeding. One house was "very tiny and cluttered [and] not clean." (Tr. 64) This house also had a strong odor because J.S.'s grandmother, being a double amputee, was not well cared for by Mother. The second house, where Mother was living at the time of the termination hearing, had no furniture except for two mattresses placed on floors in the house. CASA Elsten tried to take pictures of the home, but Mother did not allow her to do so. CASA Elsten stated that it did not appear that any work was taking place on the house and that it looked as if it were abandoned. J.S. also mentioned to CASA Elsten how dirty Mother's first home was and that he did not like the bugs crawling on him. J.S. told her that he liked the clean house and food he has with his foster mother.

Brenda Rader ("Rader"), J.S.'s home based therapist, also testified that termination of Mother's parental rights was in J.S.'s best interests. Rader referred J.S. to a psychiatrist for an evaluation. Based on that evaluation and the behaviors J.S. displayed, J.S. was diagnosed with post-traumatic stress disorder attributed to his experiences with Mother. Rader testified that when she began working with J.S., she observed a very angry, scared boy. Along with his anger, J.S. had nightmares and found it difficult to verbalize his feelings. Rader received phone calls from J.S.'s school and foster mother about his behavior after visits with Mother. After visits, J.S. would disrupt class to the point that the

6

school considered suspending him. Rader testified that once visits with Mother stopped, J.S.'s behavior improved almost immediately. The improvement was so drastic that Rader recommended that visitation with Mother not be reinstated. Rader was unsure if a time would come where Mother could be reintroduced into J.S.'s life. However, she testified that reunification would be detrimental to his progress.

Finally, Nicole Zielinski ("FCM Zielinski"), the family case manager, testified that termination of Mother's parental rights was in J.S.'s best interests. FCM Zielinski observed many of the behaviors Rader noted. On some occasions, J.S. would threaten FCM Zielinski and tell her to "shut up." (Tr. 76). At the time of the termination hearing, she noted that J.S. "was not the same child. He's not angry. He's outgoing. He's affectionate." (Tr. 78). She further testified that termination of parental rights was in J.S.'s best interests because he was thriving from the stability of his foster home.

After hearing evidence at the fact-finding hearing, the juvenile court issued an order on August 13, 2013 concluding that there was a reasonable probability that the conditions that resulted in J.S.'s removal from Mother would not be remedied because at the time of the termination hearing, Mother still struggled with substance abuse issues as well as securing adequate housing and income. The juvenile court further found that the parent-child relationship posed a threat to J.S.'s well-being. Further, the juvenile court found that termination of Mother's parental rights was in J.S.'s best interest because of the effects Mother's neglect had on J.S. and the fact that he improved significantly after his removal from Mother's care. Mother now appeals.

7

DECISION

Although parental rights are of a constitutional dimension, the law allows for termination of these rights when parties are unable or unwilling to meet their responsibility. *In re A.N.J.*, 690 N.E.2d 716, 720 (Ind. Ct. App. 1997). The purpose of termination of parental rights is not to punish parents but to protect children. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied*.

In reviewing the termination of parental rights, we will neither reweigh the evidence nor judge the credibility of witnesses. *In re I.A.,* 934 N.E.2d 1127, 1132 (Ind. 2010). We consider only the evidence most favorable to the judgment. *Id.* Where the trial court has entered findings of fact and conclusions of law, we apply a two-tiered standard of review. *Id.* We must determine whether the evidence supports the findings and then whether the findings support the judgment. *Id.* We will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the conclusions or the conclusions do not support the judgment. *Id.*

When DCS seeks to terminate parental rights pursuant to INDIANA CODE § 31-35-2-4(b)(2), it must plead and prove, in relevant part:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

* * * *

(B) that one (1) of the following is true:

8

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside of the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has on two (2) separate occasions, been adjudicated a child in need of services.

(C) that termination is in the best interests of the child . . . .

Because subsection (b)(2)(B) is written in the disjunctive, DCS need prove only one of the three elements by clear and convincing evidence. *See Bester v. Lake Cnty. Office of Family and Children*, 839 N.E.2d 143, 153 n.5 (Ind. 2005). These allegations must be established by clear and convincing evidence. *I.A.*, 934 N.E.2d at 1133. If the trial court finds the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. I.C. § 31-35-2-8(a).

Mother argues that DCS failed to present clear and convincing evidence supporting the termination of her parental rights. She does not challenge any factual findings of the juvenile court. Rather, she recites the testimony of several service providers, compares it to her own testimony, and concludes that the juvenile court erred in terminating her parental rights because it discounted her personal struggles in complying with the dispositional order. This is simply a request that we reweigh the evidence, which we will not do. *I.A.*, 934 N.E.2d at 1132. Our review of the record shows that the evidence supports the trial court's findings, and those findings support its conclusion to terminate Mother's parental rights.

1. Conditions Remedied

9

To determine whether a reasonable probability exists that the conditions justifying a child's continued placement outside of the home will not be remedied, the trial court must judge a parent's fitness to care for the child at the time of the termination hearing, taking into consideration any evidence of changed conditions. *A.N.J.*, 690 N.E.2d at 721. The trial court must also evaluate the parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* A trial court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Additionally, the trial court can properly consider the services offered by DCS to the parent and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there is no reasonable probability that the conditions will change." *L.S.*, 717 N.E.2d at 210.

Here, DCS removed J.S. from Mother's care because their home was in poor condition and contained an active methamphetamine lab near J.S.'s bedroom. While it appears from the record that Mother no longer lives in a residence where she permits the manufacture of methamphetamine, her substance abuse and ability to secure and maintain appropriate housing remain as issues. She did complete her initial substance abuse evaluation and began treatment, but her counselor testified that she "just stopped coming." (Tr. 38). Mother violated her probation because of failed drug screens and served the

10

remainder of her suspended sentence in the Department of Correction. We acknowledge that she started some services on her own after DCS stopped offering services. However, Mother still tested positive for drugs after her release, putting her at risk of violating parole and returning to prison. She also refused to take court-ordered drug screens unless she could see J.S. As for securing and maintaining appropriate housing, at the time of the hearing, Mother lived in what CASA Elsten described as a house that looked abandoned and only had two mattresses as furniture. This evidence supports the juvenile court's finding that "[t]he child has been in [foster] care for approximately twenty[-]four months and mother is no closer to having the child return to her care [than] when the child was first removed." (App. 34). Accordingly, the trial court did not err in concluding that the conditions that resulted in J.S.'s removal and continued placement outside of Mother's care would not be remedied.

2. Best Interests

Concerning the "best interests of the child" statutory element, the trial court is required to consider the totality of the evidence and determine whether the custody by the parent is wholly inadequate for the child's future physical, mental, and social growth. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans. denied*. In making this determination, the trial court must subordinate the interest of the parent to that of the child involved. *Id*. The recommendations of the service providers that parental rights be terminated support a finding that termination is in the child's best interests. *See A. J. v. Marion Cnty. Office of Family and Children*, 881 N.E.2d 706, 718 (Ind. Ct. App. 2008), *trans. denied*.

11

Here, Mother argues that "[t]he evidence presented by DCS merely establishes reasons for [J.S.'s] initial removal and it would not necessarily reflect probabilities of future neglect or abuse." (Mother's Br. 15). We disagree. The evidence showed the effects of Mother's neglect. In Mother's care, J.S. was a five-year-old boy without structure and the skills to start school. The evidence also shows dramatic improvement in J.S.'s behavior and overall outlook almost immediately upon stopping visits with Mother. The trial court need not wait until the child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*. Therefore, the juvenile court did not err in concluding that the termination of Mother's parental rights was in J.S.'s best interests.

DCS presented clear and convincing evidence, and the juvenile court did not err in terminating Mother's parental rights.

Affirmed.

FRIEDLANDER, J., and MATHIAS, J., concur.