**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 09 2013, 6:24 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JEFFREY E. STRATMAN**
Aurora, Indiana

ATTORNEYS FOR APPELLEE:

**AMANDA TEBBE CANESSA**
DCS Dearborn County
Lawrenceburg, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE INVOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: R.J. AND T.W. (minor children), | ) ) ) ) ) | |
| C.J. (Mother) and K.J. (Father), | ) ) | |
| Appellants-Respondents, | ) ) | |
| vs. | ) ) | No.  15A01-1207-JT-427 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

APPEAL FROM THE DEARBORN CIRCUIT COURT
The Honorable James D. Humphrey, Judge
Cause No. 15C01-1109-JT-27; 15C01-1109-JT-28

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**PYLE, Judge**

STATEMENT OF THE CASE

In this consolidated appeal, C.J. ("Mother") appeals the involuntary termination of parental rights to her children, T.W. and R.J. (collectively the "children"). K.J. ("Father"), father of R.J., also appeals the involuntary termination of his parental rights.[1]

We affirm.

ISSUE

Whether the Department of Child Services ("DCS") presented clear and convincing evidence to support the termination of Mother's and Father's parental rights.

FACTS

T.W. was born in May of 2004. Her brother, R.J., was born in May of 2007. In May 2010, DCS received a report alleging that domestic violence between Mother and Father had occurred in the presence of the children. An initial investigation by DCS showed a previous incident of domestic violence between Mother and Father in 2009. Regarding the May 2010 incident, Mother and Father were arguing about Mother leaving their apartment. As Mother tried to leave, Father pinned her up against a wall. Mother banged on a neighbor's door for help, and the police arrived shortly thereafter. The children witnessed the entire incident, and Father was placed under arrest. When the

---

[1] A petition was also filed to terminate the rights of T.W., Sr., father of T.W. The trial court denied the petition to terminate his parental rights.

family case manager interviewed Mother about the May 2010 incident, another man, L.H., was in her apartment. L.H. had previously been convicted of battering Mother in front of the children in February of 2010. L.H. was placed on probation and ordered not to have contact with Mother or the children. After interviewing Mother and observing that she and L.H. were violating the no-contact order, DCS filed a petition alleging that T.W. and R.J. were children in need of services ("CHINS"). The children were removed from the home, and Mother and Father admitted that the children were CHINS.

During the CHINS proceeding, DCS recommended that Mother participate in individual counseling or therapy, family counseling or therapy with the children, complete a psychiatric evaluation, and complete services with Safe Passages or some other domestic violence course. DCS recommended that Father participate in the Nurturing Father's Program and participate in counseling.

DCS's first progress report, covering the time period of August 20, 2010 to November 12, 2010, stated that Mother failed to complete parenting classes because of missed sessions. Mother also did not consistently attend her counseling sessions. Father participated in the Nurturing Father's Program and counseling, worked full time, and was seeking appropriate housing.

When DCS issued its second progress report covering the time period of November 20, 2010, to March 3, 2011, Mother had completed parenting classes as requested. However, Mother went to Father's home despite a no-contact order between them. The police were called, and Father was arrested. Before Father's arrest, Father had participated in services as requested by DCS. Despite a no-contact order between

3

Mother and L.H., Mother also lived with L.H. at L.H.'s father's house. Mother subsequently moved out, but she allowed L.H. to move in with her. DCS did a home-check on Mother's new residence and allowed visits with the children as long as L.H. was not present. DCS later confirmed that a verbal altercation took place between Mother and L.H. The police were called, and L.H. was asked to leave the residence. Because of the altercation, DCS decided to no longer allow Mother to have home visits with the children.

At a progress hearing on March 3, 2011, Mother essentially told the trial court that she was still living with L.H., that he was not a danger to her children, and that she intended to keep living with him. DCS issued a third progress report covering March 4, 2011 to June 1, 2011.[2] By this time, Mother had met with Safe Passage as requested by DCS. However, Community Mental Health Center, where Mother participated in therapy, reported that Mother was "not utilizing therapy and not progressing toward treatment goals." (App. 90). Mother was confronted about her lack of progress; she responded that "her lawyer will be handling everything for her in relation to getting her children back." (App. 91).

DCS issued another report covering the time of June 2, 2011 to August 31, 2011. During that time, Mother had stopped participating in services from March through July 2011. Father was released from incarceration and resumed services. DCS began to consider terminating the parental rights of Mother and Father.

---

[2] There was no information provided on Father in DCS's March report, most likely because Father was incarcerated for allegedly violating the no-contact order between himself and Mother.

On September 14, 2011, DCS filed petitions to terminate Mother's and Father's parental rights. The trial court held an initial hearing on the termination motion on November 28, 2011. A fact-finding hearing began on February 21, 2012 and concluded on June 20, 2012. At the time of the hearing, Mother testified that she was not dating, was working and making seven dollars and twenty-five cents ($7.25) per hour, and was living alone in a one bedroom apartment. Father was incarcerated at the Dearborn Law Enforcement Center facing new charges of felony domestic battery in the presence of a child, felony domestic battery with allegations of a previous conviction for battering the same victim, and interfering with the reporting of a crime.[3]

Following the termination hearing, the trial court issued an order on July 12, 2012 terminating Mother's and Father's parental rights to the children. The trial court's order contained extensive findings of fact and conclusions of law. Regarding Mother, the trial court found, in relevant part:

> 8. That as part of disposition in the Child in Need of Services action, [M]other was to participate in and complete certain services and therapy. This included individual counseling and therapy, completing a psychiatric evaluation, participating in parent education, services with Safe Passages Women's Shelter and/or attend Domestic Violence Class.
>
> 9. That [M]other . . . lives in a one-bedroom apartment, is employed at $7.25 per hour, twenty-five (25) hours per week. Advises [sic] that she would sleep in the living room or on the floor so that children would have a place to sleep.

* * * *

---

[3] The alleged victim in Father's latest arrest does not appear to be Mother.

19. Mother . . . stated that over three and a half (3 ½) to four (4) years [she was in a relationship with Father], he abused her fifteen (15) times, nine (9) times in front of the children.

20. That following disposition [M]other . . . was inconsistent in her participation in services, including parenting classes. In fact, due to the number of missed visits[,] she had to go back and complete the parenting classes a second time. Mother's progress was minimal due to inconsistency with visitation and with counseling. Mother did not appear to be concerned with the [children].

21. That [Mother's] behavior shows that she has been involved in a pattern of abusive relationships. [Mother] testified that she was abused by [T.W., Sr.], Father, and by [L.H.] and that violence was committed against her in the presence of the children by each of these men.

> A. Mother testified that boy friend [sic], [L.H.] broke her nose in the presence of the children.
>
> B. [Mother] stated that [Father] had abused her fifteen (15) times, nine (9) times in front of the children.
>
> C. That she was with T.W., Sr. for eight (8) years and that he only choked her a couple of times, but not in front of the children.

22. The Court further finds that when the children were removed from [Mother] that she chose [L.H.] over the relationship with her children. Evidence further shows that [Mother] indicated that she ended the relationship in August of 2011. The Court further finds that [Mother] remained with [L.H.] while she was taking classes and therapy and was supposed to be engaged in services support [sic] of the Child in Need of Services action. She stated that she did not work with Safe Passages Domestic Violence Shelter because they did not seem helpful.

23. When the CHINS Petition was first filed[,] [Mother] did not take these proceedings seriously. She only met with her counselor, Ms. Kathman, fifty per cent [sic] (50%) of the time. Witness Gail Holten testified, and the Court finds, that [Mother] dropped out of classes through Community Mental Health Center, and that she was more focused on [L.H.], than seeking help. In fact, [L.H.] came with Mother to some of the sessions.

6

24. That although [L.H.] was not permitted to have contact with the children, [Mother] would put him on the telephone and allow him to speak to the children.

25. That at a [March 3, 2011] Review Hearing in the Child in Need of Services Actions, upon questioning by Attorney Sorge, [Mother] was asked about The Department of Child Services['] concerns about [L.H.]. That [Mother] stated, "I don't he's, I don't think it's a big deal honestly. He gets visitations with his son on Wednesdays and he gets his son every weekend from Friday to Sunday. So I mean, it was Court appoint[ed] that he got that, so I don't understand how he's a harm if he gets that with his own child."

Sorge: Is he still living with you?

[Mother]: Yes.

Sorge: Is it your intention to continue that arrangement?

[Mother]: Yes.

That based upon this language the Court finds that [Mother] made a conscious decision to choose her abusive boy friend [sic] over her children.

26. That the abusive atmosphere in which the children have been raised has been harmful to the children. (See testimony of Foster Parents).

* * * *

28. By the findings in this cause of action, the Court further finds that [Mother] is not being punished for being a victim of domestic violence. [Mother's] failure to make decisions consistent with the best interest of her children and to carry-through with necessary changes continues to create a danger to the children.

(App. 390-393).

Regarding Father, the trial court found in relevant part that:

11. [Father] has a history of family and domestic violence and aggressiveness. This history includes the following:

7

A. Conviction for the offense of criminal confinement—October 7, 2009, Dearborn Circuit Court. See Petitioner's Exhibits 6 and 9.

B. Probation Violation under criminal confinement conviction—February 17, 2011.

C. Domestic Battery dated September 24, 2010. See Petitioner's Exhibit 8. The probation violation also referred to Exhibit 5.

D. Invasion of Privacy—March 29, 2011, See Petitioner's Exhibit 4.

[Father] has been arrested twice during the pendency of this case. [Father] is currently incarcerated at the Dearborn County Law Enforcement Center. The most recent arrest occurred, according to Father, approximately one (1) month prior to the final hearing date in this matter and included charges of domestic battery in the presence of a child, a Class D Felony; interference with reporting a crime, a Class A Misdemeanor; and Domestic Battery with a prior offense, a Class D Felony. During the pendency of the case [Father] has engaged in aggressive, sometimes irrational behavior with service providers. Evidence presented shows that he would sometimes yell at service providers and that service providers were fearful of him.

\* \* \* \*

16. That Witness, Gail Holten, Community Mental Health Center Service Provider, indicated that [Father's] behavior during services was sometimes sophomoric, [that he] engaged [in] inappropriate behavior and was distract[ed] and that [he] sometimes would leave classes angry. [Father], while participating in classes, made inappropriate comments about another female participant i.e. that he didn't mind coming because "she is cute."

(App. 388-390).

The trial court concluded that "there is a reasonable probability that the conditions that resulted in the [children's] removal or reason for placement outside the parents' home will not be remedied and/or the continuation of parent/child relationship poses a threat to the well-being of the child," and terminated Mother's and Father's parental rights. (App. 393).

8

Mother and Father argue that the trial court erred by ordering the involuntary termination their parental rights.

Although parental rights are of a constitutional dimension, the law allows for termination of these rights when parties are unable or unwilling to meet their responsibility. *In re A.N.J.*, 690 N.E.2d 716, 720 (Ind. Ct. App. 1997). The purpose of termination of parental rights is not to punish parents but to protect children. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied*.

In reviewing the termination of parental rights, we will neither reweigh the evidence nor judge the credibility of witnesses. *In re I.A.,* 934 N.E.2d 1127, 1132 (Ind. 2010). We consider only the evidence most favorable to the judgment. *Id*. Where the trial court has entered findings of fact and conclusions of law, we apply a two-tiered standard of review. *Id*. We must determine whether the evidence supports the findings and then whether the findings support the judgment. *Id*. We will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. A judgment is clearly erroneous if the findings do not support the conclusions or the conclusions do not support the judgment. *Id*.

When DCS seeks to terminate parental rights pursuant to Indiana Code § 31-35-2-4(b)(2), it must plead and prove, in relevant part:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

9

* * * *

(B) that one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside of the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has on two (2) separate occasions, been adjudicated a child in need of services.

(C) that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2). Because subsection (b)(2)(B) is written in the disjunctive, DCS need prove only one of the three elements by clear and convincing evidence. *See Bester v. Lake County Office of Family and Children*, 839 N.E.2d 143, 153 n.5 (Ind. 2005). These allegations must be established by clear and convincing evidence. *I.A.*, 934 N.E.2d at 1133. If the trial court finds the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. I.C. § 31-35-2-8(a).

1. Threat to Well-Being

Mother and Father argue that the juvenile court erred in finding that DCS presented clear and convincing evidence that the continuation of the parent-child relationship with T.W. and R.J. posed a threat to the children's well-being. Both Mother and Father allege that the juvenile court based this finding on the premise that Mother will continue to engage in relationships with abusive men. Father separately argues that DCS presented no evidence showing that he was a threat to R.J.

10

The trial court should judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996). "However, a parent's habitual patterns of conduct must also be considered to determine whether there is a substantial probability of future neglect or deprivation." *Id.* "[A] trial court does not need to wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship." *Castro v. Ind. Office of Family & Children*, 842 N.E.2d 367, 372 (Ind. Ct. App. 2006). When the evidence shows that the emotional and physical development of a child is threatened, termination of parental rights is appropriate. *Id.*

As to Mother, we acknowledge that at the time of the hearing she was not dating, working a job making $7.25 per hour, and living alone in one bedroom apartment.[4] However, we cannot ignore the record of Mother repeatedly engaging in abusive relationships, exposing the children to the violence of these relationships, and not ending these relationships until DCS permanently removed the children from her care. Mother does not dispute her involvement in abusive relationships with three men. Indeed, she admitted during the fact-finding hearing that Father physically abused her in front of the children at least nine (9) times. During one incident, Father pushed T.W. down stairs while T.W. tried to stop Father from hitting Mother. Mother maintained a relationship with her most recent boyfriend, L.H., even though he broke Mother's nose in front of the children. L.H. was convicted of battery, placed on probation, and was ordered to have no

---

[4] Mother had two beds for the children in the bedroom of her apartment and planned to sleep on a futon in another room.

contact with Mother or the children. Yet, Mother still maintained contact and allowed L.H. to communicate with the children as well. Mother attempts to lessen the significance of these facts by stating that she wanted to move forward with L.H. and the children as a family. However, during a review hearing on March 3, 2011, Mother essentially stated that L.H. was not a danger to her or the children and that she intended to continue living with him. Though Mother ended the relationship with L.H. by the time of the termination hearing, the damage to her children had already taken its effect.

Janet McKinley ("McKinley") served as the children's foster mother; T.W. for six months and R.J. for over fifteen months. McKinley testified that T.W. constantly had temper tantrums that would manifest in T.W. hitting, kicking, punching, and biting McKinley and R.J. McKinley further stated that T.W.'s behavior escalated to the point that she requested T.W. be placed elsewhere after six months. McKinley said that, based on her observations, T.W.'s outbursts appeared to be more than mere disobedience. McKinley was concerned that T.W.'s behavior would be a bad influence on R.J. In fact, after T.W. and R.J. were placed in another foster home, R.J. began having the same type of violent outbursts as T.W. It is not unreasonable to infer that the violence witnessed throughout Mother's relationships has influenced the children to act in the same manner.

As to Father, we note that at the time of the hearing that he participated in some services in an attempt to modify his behavior. While some service providers recognized progress, we cannot ignore Father's criminal history and arrests during the pendency of the case. The trial court found that father "has a history of family and domestic violence and aggressiveness." (App. 388). Father has convictions for the following crimes: (1)

12

criminal confinement in 2009; (2) domestic battery in 2010; and (3) invasion of privacy in 2011. At the time of the termination hearing, Father was incarcerated on pending charges of felony domestic battery in the presence of a child, felony domestic battery with allegations of a previous conviction for battering the same victim, and interfering with the reporting of a crime. Accordingly, the evidence supports the trial court's findings, and those findings support the conclusion that continuation of Mother's and Father's parent-child relationship poses a threat to the well-being of the children.

2. Best Interests

Mother and Father also contend that DCS failed to prove that termination of their parental rights was in the best interests of T.W. and R.J. Specifically, Mother and Father appear to argue that the evidence only shows that there are better places for T.W. and R.J. to live, and that the trial court cannot terminate their parental rights solely based on that evidence.

For the "best interests of the child" statutory element, the trial court is required to consider the totality of the evidence and determine whether custody by the parent is wholly inadequate for the child's future physical, mental, and social growth. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans. dismissed*. In making this determination, the trial court must subordinate the interest of the parent to that of the child involved. *Id.*

In this case, the recommendations of the service providers that parental rights be terminated support a finding that termination is in the child's best interests. *See A.J. v. Marion County Office of Family and Children*, 881 N.E.2d 706, 718 (Ind. Ct. App. 2008),

13

*trans. denied.* For example, several of the service providers noted some progress on the part of both Mother and Father. However, in the case of both parents, the progress was not consistent. A majority of the providers and caseworkers recommended the termination of Mother's and Father's parental rights. These recommendations, along with the evidence previously reviewed, support the trial court's finding that termination of Mother's and Father's parental rights was in the best interest of the children.

Accordingly, we find no error in the trial court's findings of fact and conclusions and affirm the order terminating Mother's and Father's parental rights.

Affirmed.

KIRSCH, J., and VAIDIK, J., concur.