**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Mar 11 2014, 10:15 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MICHAEL B. TROEMEL**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
**ROBERT J. HENKE**
**DAVID E. COREY**
Office of the Indiana Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: K.S. & A.S. (minor children); | ) ) ) ) |
| K.D. (Mother) | ) ) |
| Appellant-Respondent, | ) ) |
| vs. | ) ) No. 04A04-1305-JT-225 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner. | ) ) |

APPEAL FROM THE BENTON CIRCUIT COURT
The Honorable Rex W. Kepner, Judge
Cause Nos. 04C01-1211-JT-83 and 04C01-1211-JT-85

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**PYLE, Judge**

STATEMENT OF THE CASE

K.J.D. ("Mother") appeals the involuntary termination of parental rights to her children, K.S. and A.S. (collectively "the children").

We affirm.

ISSUE

Whether the Department of Child Services ("DCS") presented clear and convincing evidence to support the termination of Mother's parental rights.[1]

FACTS

K.S. was born on March 20, 2003. Her sister, A.S., was born on February 19, 2007. On June 16, 2011, DCS received a report that Mother and the children were living in a garage that had no ventilation, water, bathroom, or windows. On June 21, 2011, DCS family case manager Angelina Brouillette ("FCM Brouillette") and Deputy Don Munson ("Deputy Munson") with the Benton County Sheriff's Department went to the home. Mother and the children were sleeping on couches in the garage. Deputy Munson and FCM Brouillette saw trash and broken glass on the floor along with food that had bugs crawling in it. All of Mother's and the children's belongings were stored in the garage. Mother's father, W.D., confirmed that Mother and the children had been living in his garage for about a month. Deputy Munson and FCM Brouillette told Mother to

---

[1] The juvenile court also terminated the parental rights of M.S., father of the children. He did not appeal.

move the children into W.D.'s house. They also told Mother that they would return to check on Mother and the children. Mother was warned that if the children were found living in the garage again, DCS would take custody of the children.

On June 30, 2011, Deputy Munson and FCM Brouillette returned to the home at 7:30 A.M. and found Mother and the children sleeping in the garage. Mother claimed that they had only been in the garage for a few hours playing games with her brother before falling asleep. However, when preparing to take the children, Deputy Munson and FCM Brouillette did not need to go into the house to gather any of the children's items, as they were all in the garage. The children were removed from Mother's care. On July 1, 2011, the juvenile court held a detention hearing and found probable cause to believe the children were children in need of services ("CHINS"). On July 7, 2011, Mother appeared with counsel at an initial hearing and entered a denial to the CHINS allegations. The juvenile court scheduled a fact-finding hearing for August 31, 2011. After conducting the fact-finding hearing, the juvenile court adjudicated the children as CHINS.

On September 7, 2011, the juvenile court held a dispositional hearing. At that hearing, Mother agreed with DCS's recommendation for services, and the juvenile court entered an extensive order detailing Mother's required services. Among many things, the juvenile court order required Mother to complete a psychological evaluation, participate in services recommended by DCS, particularly those geared toward improving and maintaining her mental health, and maintain a stable and nurturing environment for her children on a long-term basis.

3

The juvenile court held its first review hearing on November 16, 2011. Mother met consistently with service providers, but was not taking her medications on a regular basis. At times, Mother would tell FCM Brouillette that taking medications was not necessary and that she could address her problems on her own. Later, Mother would change her mind and resume taking her medication. In addition, her visits with the children were inconsistent, and Mother was living in a homeless shelter. While at the homeless shelter, Mother began a relationship with J.M. FCM Brouillette, Linda Harris, the Guardian Ad Litem ("GAL Harris"), and the juvenile court all cautioned Mother to make her mental health and reunification with her children her main priority.

As to four-year-old A.S., FCM Brouillette testified that A.S. was not potty trained and that she could only say a few words before she would begin babbling as an infant. Since A.S.'s removal from Mother, her speech had improved slightly. According to testing performed on A.S., there were no medical causes for her delay in speaking or potty training. K.S. was getting good grades in school, but her teachers had concerns about her ability to focus. All parties agreed that services to reunite the family should continue, and the juvenile court scheduled another review hearing.

The next review hearing took place on February 15, 2012. At the time of the hearing, FCM Brouillette reported that Mother had checked herself into a psychiatric facility. Mother was attending therapy sessions but repeatedly asked to switch therapists because she was not getting along with them. Mother was only taking her medication on a regular basis when receiving inpatient treatment at a hospital. Mother continued to be

4

homeless, periodically staying at a shelter in the Lafayette area. The court scheduled the matter for a permanency hearing.

The court held a permanency hearing on June 21, 2012. At this time, Mother and J.M. had leased an apartment and purchased a vehicle. Mother had also secured income in the form of Social Security. However, she had not visited with the children since January 2012. FCM Brouillette testified that Mother would miss or cancel appointments and only as recently as a week before the June hearing had called to reschedule missed appointments. Some of Mother's absences were due to inpatient treatment for her mental health problems. At this point, Mother had been in the hospital for treatment six (6) to nine (9) times. FCM Brouillette also stated that K.S. had begun therapy because she had been sexually abused by her half-brother, M.D., who is also a child of Mother. FCM Brouillette recommended that the permanency plan should change from reunification to termination of Mother's parental rights.

One of Mother's service providers, Missy Kalbaugh ("Kalbaugh") testified at the permanency hearing that Mother relied on J.M. and others too much to keep her stable. Specifically, Kalbaugh testified that Mother often relied on J.M to lead her in doing her necessary tasks. Finally, Mother was not taking her medication all of the time. According to Kalbaugh, Mother wanted to "do it on her own" because she claimed that she did not need her medication and refused to take it. (Tr. 106). Mother also believed that because J.M managed his mental health problems without medication, she could do so as well. Eventually, DCS terminated Mother from services because of missed appointments and her refusal to meet with the service providers.

Despite the testimony from the service providers, GAL Harris observed that Mother appeared to be a different person from the one the parties had observed at prior review hearings. She recommended that Mother be given "a little bit more of an opportunity to prove that she can sustain the improvement that she has made." (Tr. 131).

After hearing the testimony, the juvenile court continued to believe that the court's goal should be reunification. The juvenile court scheduled another permanency hearing. However, it cautioned Mother that she needed to make progress concerning her ability to take care of herself and her children.

The juvenile court held another permanency hearing on August 22, 2012. Mother had visitation with the children twelve (12) hours per week and participated in home based therapy and anger management classes. A focus of Mother's therapy was providing a safe environment for K.S. to prevent any further sexual abuse. Mother missed two therapy appointments and was still living in an apartment with J.M. However, she told her service providers that she and J.M. could no longer afford to live there. DCS recommended continuing with reunification as the plan for Mother and the children; GAL Harris and the juvenile court agreed.

On October 25, 2012, Mother was involved in an altercation with J.M. and another woman. The other woman alleged that during the altercation, Mother struck her young child. Mother was arrested and later charged with two counts of Class A misdemeanor battery on J.M. and the other woman. On November 1, 2012, DCS filed petitions to terminate Mother's parental rights to the children. The court held an initial hearing on November 29, 2012 and entered a denial on behalf of Mother.

6

On December 5, 2012, the juvenile court held another permanency hearing. At this time, Mother and J.M.'s relationship had ended after the altercation in October. Mother had been evicted from her apartment in Lafayette, and she moved into a trailer in Otterbein. Mother also admitted to taking a large amount of her medication at once and cutting her arms, though she denied it was a suicide attempt. The incident required that Mother be taken to the emergency room.

Melissa Odar ("Odar"), a service provider who had been working with Mother and K.S. since June 2012, testified that Mother had expressed some doubt that K.S. had been molested. Odar had to explain to Mother that "it's been substantiated and K.S. vocalized that it [had] happened." (Tr. 170) Odar further testified that she was not able to spend much time with Mother on parenting skills because of the need to work with Mother on basic living skills such as consistently maintaining stable housing with functioning utilities.

Concerning her work with K.S., Odar testified that K.S. "struggles a lot with knowing what is going to happen with the case. She doesn't know if she is going to stay with her foster placement or go with her mom and she would like an answer to that. She struggles with anxiety when mom visits." (Tr. 171).

FCM Brouillette testified that in the fifteen months that she was involved with the case, Mother had been to the hospital at least eleven times; three times for suicide attempts and the remaining times for extreme bouts of anxiety. FCM Brouillette stated that the permanency plan for the case should be moved to termination because of Mother's instability with her parenting skills and mental health despite all of the

reunification services provided by DCS. FCM Brouillette did acknowledge that at one time, Mother was able to obtain housing, income, and transportation. However, Mother continued to struggle with believing that K.S. was molested and was focusing more attention on J.M. than reuniting with the children.

GAL Harris stated to the court that she had been supportive of giving Mother more time to show improvement and reunite with the children. However, at the time of this hearing, GAL Harris felt that Mother's continued instability combined with the children's desire and need for closure justified terminating Mother's parental rights. The juvenile court found that termination of parental rights and adoption of the children was an appropriate plan. The trial court scheduled a termination hearing for April 9, 2013.

After the termination hearing on April 9, 2013, the juvenile court entered the following findings of fact and conclusions of law on May 3, 2013:

### FINDINGS OF FACT

1. [K.S.] was born on March 20, 2003 and is currently ten (10) years of age. [A.S.] was born on February 19, 2007 and is currently six (6) years of age.

2. The legal and biological mother of [K.S.] and [A.S.] is [Mother].

3. The legal and biological father of [K.S.] and [A.S.] is [M.S.].

4. Both children were initially removed from the care of their parents on June 30, 2011, and have remained out of the care of their parents and under the supervision of DCS continuously since that date, a period of more than fifteen months of the twenty-two months immediately preceding the filing of the Verified Petitions for Involuntary Termination of Parent Child Relationship.

5. Following the removal of the children, Verified Petitions Alleging Child In Need of Services were filed by DCS . . . . Dispositional Decrees

8

were entered therein on September 7, 2011, in which the Court ordered the removal of the children from the care of their parents.

6. The children have remained out of the care of their parents continuously since the entry of said Dispositional Decree, which is a period in excess of six (6) months.

7. The conditions that resulted in the removal of the children from the care of the parents were that the children were living with their mother in the garage of the maternal grandfather's home. The conditions in the garage were unsafe and dangerous to the health and safety of the children. The mother was unable at that time to provide the children with a safe, stable, and appropriate home, and had mental health problems that interfered with her ability to safely supervise the children. The father of the children had been incarcerated for sexual offenses committed against a thirteen year old female child. Due to his incarceration, the father was unavailable to provide care or supervision for the children. [K.S.] was the victim of a sex offense committed by her half-sibling, [M.D.]. As a result, she was in need of treatment, and of protection from [M.D.] and any other possible perpetrator. She was in need of support, guidance, and protection from her mother.

8. The reasons for continued placement of the children outside of the home and care of their parents are that the mother failed to successfully participate in and complete, court-ordered services designed to facilitate family reunification. She demonstrated chronic mental health problems, resulting in numerous emergency hospitalizations and several attempts and threatened attempts to commit suicide. She demonstrated chronically poor decision-making on issues that would have a direct impact on her ability to care for and protect her children. [Mother] has a history of confusing or distorting facts. The court feels it is likely that much of that is unintentional, but nevertheless must weigh her testimony in light of her lack of credibility. She engaged in a long term dysfunctional relationship with a man, [J.M.], who has a history of having his parental rights terminated. [Mother] regularly focused on her relationship with [J.M.] to the detriment or exclusion of her relationship with her children. This relationship resulted in her being arrested for battery after she confronted [J.M.] about his lack of faithfulness to her, and for allegedly stealing her property. During this confrontation, a child was struck. She continued to pursue this relationship even after this incident and her arrest. She continued to be unable to provide a safe, stable home for the children, and had continuing difficulties in obtaining and maintaining employment or a means of financial support for the

9

children. She chose not to pursue or exercise visitation with her children. She chose to disbelieve allegations made by her daughter, [K.S.], that [M.D.] had sexually molested her. As such, she was unable to provide the support, treatment, and protection that [K.S.] needed as a result. The Court finds that the mother has made some progress in the few months leading to this hearing, in that she has secured employment and a home, has apparently ended her relationship, and has participated in services on a consistent basis. She has begun to accept that her son, [M.D.], sexually molested [K.S.]. The father continued in long-term incarceration with the Department of Correction and was unavailable. The [guardian ad litem] recommended termination of parental rights.

## CONCLUSIONS OF LAW

Based upon the foregoing Findings of Fact, the Court finds the following by clear and convincing evidence:

1. There is a reasonable probability that the conditions that resulted in the removal of the children, and the conditions that resulted in the continued placement of the children outside of the care of the parents, will not be remedied. The children have remained in temporary placement outside the care of the parents for more than eighteen (18) months, during which time DCS made reasonable efforts to reunify the family by providing services to the mother. The mother has made only minimal progress in addressing the issues that caused the removal, most of which progress has occurred only in the last few months after the Petition for Termination was filed. There was a significant period of time during which the mother chose not to engage in any reunification services, including visiting with these children. Although she claims that transportation issues prevented her from attending some of her scheduled appointments, she was able to visit another child, [M.D.] while he was placed in Indianapolis. She missed services at a facility located within walking distance from her home. As of the date of the hearing herein, the mother was still, after eighteen months, not in a position to immediately assume the care and supervision of these two children. While she has made some progress in obtaining a home and in addressing her mental health issues, she continues to be unable to protect these children from potential harm. Her request that [A.S.] and [K.S.] be returned to her care immediately, in conjunction with her request that her son [M.D.] also be immediately placed in her home, when she is aware that [M.D.] previously sexually molested [K.S.], for which he is still receiving in-patient treatment, demonstrates her inability to support and protect her daughters. The father also has not

10

progressed in his ability to provide care and support for the children due to continued, long-term imprisonment.

* * * *

3. The termination of the Parent-Child Relationships are in the best interests of the children. The children are in need of permanency. They are in a safe, stable environment in which they are supported, nurtured, and encouraged, and in which all of their needs are being met. To continue their placement in temporary care to allow the mother additional time to successfully complete reunification services would deny the children the permanency they need.

4. The plan of DCS for the care and treatment of the children, for them to be adopted, is appropriate and satisfactory.

(App. 44-47). Mother now appeals.

DECISION

Although parental rights are of a constitutional dimension, the law allows for termination of these rights when parties are unable or unwilling to meet their responsibility. *In re A.N.J.*, 690 N.E.2d 716, 720 (Ind. Ct. App. 1997). The purpose of termination of parental rights is not to punish parents but to protect children. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied*.

In reviewing the termination of parental rights, we will neither reweigh the evidence nor judge the credibility of witnesses. *In re I.A.,* 934 N.E.2d 1127, 1132 (Ind. 2010). We consider only the evidence most favorable to the judgment. *Id*. Where the trial court has entered findings of fact and conclusions of law, we apply a two-tiered standard of review. *Id*. We must determine whether the evidence supports the findings and then whether the findings support the judgment. *Id*. We will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. A judgment is

11

clearly erroneous if the findings do not support the conclusions or the conclusions do not support the judgment. *Id.*

When DCS seeks to terminate parental rights pursuant to Indiana Code § 31-35-2-4(b)(2), it must plead and prove, in relevant part:

* * * *

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside of the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has on two (2) separate occasions, been adjudicated a child in need of services.

(C) that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2). Because subsection (b)(2)(B) is written in the disjunctive, DCS need prove only one of the three elements by clear and convincing evidence. *See Bester v. Lake County Office of Family and Children*, 839 N.E.2d 143, 153 n.5 (Ind. 2005). If the trial court finds the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. I.C. § 31-35-2-8(a).

1. Conditions Remedied

Mother argues that the trial court erred in concluding that there was a reasonable probability that the conditions which supported the children's continued placement outside of the home would not be remedied. Specifically, Mother claims that her

12

progress at the time of the termination hearing should have led the trial court to make a finding in her favor.

To determine whether a reasonable probability exists that the conditions justifying a child's continued placement outside of the home will not be remedied, the trial court must judge a parent's fitness to care for the child at the time of the termination hearing, taking into consideration any evidence of changed conditions. *A.N.J.*, 690 N.E.2d at 721. The trial court must also evaluate the parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* A trial court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing. *McBride v. Monroe Cnty. Office of Family and Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 1999). Additionally, the trial court can properly consider the services offered by DCS to the parent and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that conditions will change." *L.S.*, 717 N.E.2d at 210.

We acknowledge that Mother has made progress in securing appropriate living conditions for the children. However, the inconsistency in her ability to manage her mental health supports the juvenile court's finding that the conditions that resulted in the continued placement of the children outside of her care would not be remedied. Mother was hospitalized several times for extreme bouts of anxiety. Three other visits to the

13

hospital were for suicide attempts. The only time Mother appeared to function well was during her relationship with J.M. and shortly before the juvenile court terminated her parental rights. In the end, J.M. was not a source of support Mother could consistently depend upon, as the relationship ended with Mother being charged with battery. Those charges were still pending at the time of the termination hearing. As to Mother's recent positive progress, the juvenile court was within its discretion to give more weight to Mother's overall performance during the CHINS proceeding. *See, e.g.*, *K.T.K. v. Indiana Dept. of Child Servs., Dearborn Cnty. Office*, 989 N.E.2d 1225, 1234 (Ind. 2013) (finding that trial court was within its discretion to disregard the efforts a parent makes shortly before a termination hearing and to give more weight to prior conduct). Accordingly, the trial court did not err, and DCS presented clear and convincing evidence that the conditions justifying continued removal of the children from Mother's care would not be remedied.

2. Best Interests

For the "best interest of the child" statutory element, the trial court is required to consider the totality of the evidence and determine whether the custody by the parent is wholly inadequate for the child's future physical, mental, and social growth. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans. dismissed*. In making this determination, the trial court must subordinate the interest of the parent to that of the child involved. *Id.* "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child." *A.K.*, 924 N.E.2d at 224. The recommendations of the service providers that parental rights be terminated support a

finding that termination is in the child's best interests. *A.J. v. Marion Cnty. Office of Family and Children*, 881 N.E.2d 706, 718 (Ind. Ct. App. 2008), *trans. denied*.

Mother argues that, "[g]iven the long term bond which had been well established between mother and her children, it is not in their best interest that the extreme remedy of termination be utilized to suddenly vaporize that important relationship." (Mother's Br. 16). However, when considering the totality of the circumstances, termination of parental rights is in the best interests of the children.

James Cheeseman ("Cheeseman"), foster parent for the children testified that K.S. mentioned several times that she wished to be adopted and did not want to return to Mother. In fact, when Cheeseman told K.S. that visitation with Mother was resuming, K.S. "laid on the couch and pouted the whole day . . . she dreaded to go [because] I think she kind of just had closure and then now it's reopened." (Tr. 326) Cheeseman further testified about the struggles potty training A.S., as she was so terrified of a toilet that her flailing around broke the seat on a few occasions.

Equally important is the recommendation of GAL Harris, who initially supported giving Mother more time to improve. In the end, even she felt that Mother had not made enough progress to reunite with the children.

Through services and a stable foster home, the children are receiving the consistency and support they need for their respective issues. These facts, combined with Mother's inability to consistently manage her mental health and the testimony of the service providers, support the trial court's conclusion that termination of Mother's parental rights was in the best interests of the children.

15

DCS presented clear and convincing evidence supporting the termination of Mother's parental rights.

Affirmed.

MATHIAS, J., and BRADFORD, J., concur.