# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 10 2020, 8:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT: G.A.

Daniel G. Foote
Indianapolis, Indiana

ATTORNEY FOR APPELLANT: T.S.
Anna Onaitis Holden
Zionsville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of Parental Rights of:

K.A., A.A., E.S. & S.A. *(Minor Children),*

and

T.S. *(Mother)* & G.A. *(Father)*

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,
*Appellee-Petitioner,*

January 10, 2020

Court of Appeals Case No.
19A-JT-1390

Appeal from the Marion Superior Court

The Honorable Mark A. Jones, Judge

The Honorable Peter Haughan, Magistrate

Trial Court Cause Nos.
49D15-1811-JT-1286
49D15-1811-JT-1287
49D15-1811-JT-1288
49D15-1811-JT-1309

**Robb, Judge.**

# Case Summary and Issue

[1] T.S. ("Mother") and G.A. ("Father") (collectively "Parents") separately appeal the juvenile court's judgment terminating their parental rights to their four children. Each parent presents several issues for our review, all of which we consolidate and restate as whether the juvenile court's order terminating Parents' parental rights was clearly erroneous. Concluding it was not clearly erroneous, we affirm.

# Facts and Procedural History

[2] Mother and Father are unmarried but have lived together for thirteen years. They have four biological children: K.A., born November 17, 2006; A.A., born June 23, 2009; E.S., born January 5, 2012; and S.A., born October 27, 2015 (collectively "Children"). E.S. and S.A. both have significant medical needs.[1]

[3] The Department of Child Services ("DCS") initially became involved with the family in November 2016 when it filed child in need of services ("CHINS") petitions due to Mother's substance abuse. In February 2017, the juvenile court approved an Informal Adjustment ("IA") for a period of six months and dismissed the CHINS case. As part of the IA, Mother began participating in home-based case management and home-based therapy and completed a

---

[1] E.S. has been diagnosed on the autism spectrum and has global developmental delays and congenital malformation syndrome. S.A. suffers from congenital hypothyroidism. Both children require multiple therapies and regular, frequent medical appointments. *See* Appealed Order at 6, ¶¶ 56-58.

substance abuse assessment. She also began a substance abuse treatment program but quit after approximately one month when the program tried to put her in group therapy. Because of her social anxiety, Mother only wanted one-on-one treatment.

[4]     On June 28, 2017, DCS filed a second petition alleging Children to be CHINS pursuant to Indiana Code section 31-34-1-1.[2] The same day, the juvenile court terminated the IA as unsuccessful and ordered Children to be removed from Parents' care. At a July 14, 2017, hearing, Father requested Children be returned to his care. Neither the Children's guardian ad litem ("GAL") nor Mother objected to Father's request, and the juvenile court ordered Children to be placed on temporary trial visitation with Father on the condition Mother was not residing in the house. Mother was authorized to have supervised parenting time with Children.[3] The juvenile court indicated it would reconsider Mother's living arrangement if she was willing to undergo a substance abuse

---

[2] The petition alleges that each child is a CHINS because:

> The child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and the child needs care, treatment, or rehabilitation that the child is not receiving; and is unlikely to be provided or accepted without the coercive intervention of the Court.

The Exhibits ("Exhibits"), Volume I at 35.

[3] The record is unclear regarding where Mother was living during the time she was required to stay out of the house.

assessment, follow all recommendations, and submit to drug screens consistently. Two weeks later, Father asked the juvenile court if Mother could return home to help with Children. The juvenile court found that Father worked six days a week from 9 a.m. to 6 p.m. and struggled with childcare for Children for about an hour at the end of each day, plus all day on Friday for S.A. Over objection by DCS and the GAL, the juvenile court entered an order allowing Mother to return home and be unsupervised with Children Monday through Thursday for the hour at the end of the day and with S.A. all day on Friday; DCS and the GAL were to conduct frequent pop-in visits during those times. Mother was ordered to continue participating in all services she had begun during the IA and maintain clean drug screens.

[5]  At a hearing on August 18, 2017, Mother admitted that Children are CHINS because the family needs assistance in providing a home free from substance abuse and therefore, the coercive intervention of the court was necessary. *See* Exhibits, Vol. I at 56. Father waived his right to a fact-finding hearing. Therefore, the juvenile court adjudicated the Children to be CHINS and ordered they remain in their current placement with Father.

[6]  The juvenile court held a dispositional hearing on September 8, 2017. Due to evidence that Parents were not being cooperative with service providers or DCS, Mother was being left alone with Children outside of the times previously authorized, and Mother had admitted to misusing prescription medication, the juvenile court ordered Children to be removed from Father's care. DCS placed Children in three separate foster homes, with E.S. and S.A. placed together in

therapeutic foster care. The juvenile court authorized Parents to have supervised parenting time with Children and entered a parental participation order for Mother to engage in home-based therapy and home-based case management and follow all recommendations; complete a substance abuse assessment and complete all treatment recommendations; submit to random drug and alcohol testing; and undergo a mental health assessment and follow all recommendations. *See id.* at 68-69. Father was not ordered to complete any services at that time because he was "never home"; Mother had the caretaking role and was most in need of services. Transcript of Evidence, Volume II at 117. Children have been out of Parents' care since this date.

[7]     Following the dispositional hearing, Mother was initially compliant with home-based therapy. At some point, Mother missed four sessions and was in danger of being discharged, but she re-engaged and had been regularly meeting with her home-based therapist for two years as of the termination hearing. Mother has made some progress in some of her treatment goals, but the main goal of sober living has not been accomplished. Her therapist testified that at no point has he been able to recommend that Children be reunited with Parents. Mother was briefly compliant with home-based case management services but did not successfully complete any case management goals. The service was closed out in December 2018 due to non-communication. Mother completed at least three substance abuse assessments but never completed a substance abuse treatment program. Mother failed to submit to multiple drug screens.

[8] In early 2018, DCS requested a hearing because it wanted Father to begin participating in services. The juvenile court issued an additional parental participation order for Father to engage in home-based therapy and follow all recommendations; complete a Father Engagement Program; submit to random drug screens; and undergo a mental health evaluation and follow all recommendations. *See* Exhibits, Vol. I at 77. Father engaged in home-based therapy but has not been successfully discharged. He participated in the Father Engagement Program for four weeks, but the program was closed out because "times started changing [and] it just didn't work out." Tr., Vol. II at 45. Regarding Father's drug screens, he tested negative each time. Father did not receive any recommendations for mental health treatment.

[9] On April 19, 2018, the juvenile court suspended Parents' visitation rights because they were having inappropriate conversations about the CHINS proceedings with Children during visitations, Mother's substance abuse continued, and Parents were not making progress in their services. Parents have not seen Children since this time because service providers have not been able to recommend resuming visits.

[10] At a permanency hearing on October 19, 2018, the juvenile court found that Mother participates in home-based therapy but has never addressed her sobriety despite repeated recommendations by DCS for substance abuse treatment; Mother had only participated in drug screens twice since August and those drug screens were positive for methamphetamines and opiates; Mother had only recently re-engaged in mental health services through a new provider; Father

participates in home-based therapy but has not made progress toward reunification; and Mother's and Father's therapists recommended a domestic violence assessment after observing bruises on Mother. *See* Exhibits, Vol. I at 102. At this time, the permanency plan changed from reunification with Parents to termination of parental rights and adoption.

[11] On November 16, 2018, DCS filed a verified petition seeking the involuntary termination of Mother's and Father's parental rights. A fact-finding hearing was held on March 19, 2019. Mother testified at the hearing that she has had periods of up to three months of sobriety but admitted she had not completed a treatment program. She also testified that if she were to submit to a drug screen that day, she would test positive, as she had used pain killers two days before the hearing. Father testified that he and Mother were still residing together and intended to continue working on their relationship. He said he was still working the same job he had been working at the outset of the CHINS case but was "looking into" finding a different job with more flexible hours. Tr., Vol. II at 42. Although he said he was able to care for Children on his own, he also said if Children were returned that day, "it would be easier on [him]" if Mother was there to help care for them. *Id.* at 39.

[12] Following the hearing, the juvenile court entered an order terminating Mother's and Father's parental rights and found, in relevant part:

> 21. Mother participated in home-based therapy throughout the case. She worked with the same home-based therapist for two years, but she failed to make any significant progress in

addressing her substance abuse or anxiety which effect multiple areas of her daily life.

* * *

24. Mother has participated in at least three substance abuse evaluations, but has not successfully followed through on any recommendations stemming from those assessments. . . .

* * *

34. Mother was unsuccessfully discharged from her home-based case management services for non-communication. None of her goals in this service were met.

35. Mother failed to actively engage in random drug screens. The [family case manager ("FCM")] has received very few screens from Mother over the course of this case, and when she asked Mother to screen, Mother would frequently respond with, "Yeah but I'm going to be dirty." This is consistent with Mother's admission that she is still an active user of methamphetamines and pain pills.

36. Mother's service providers would frequently receive calls from Father cancelling [M]other's appointments for her. . . .

37. Father's actions, such as his continued enabling of Mother's addictive behavior, domestically abusive behavior and frequent statements that he is unable or unwilling to parent the children without Mother, has prevented DCS, GAL or anybody on the team from being able to recommend the children return to his care.

* * *

39. If the [C]hildren were returned to Father, the only way for their parental obligations to be met would be for Mother to be alone with the [C]hildren a significant amount of time.

\* \* \*

41. Father's current job requires him to work six days a week from 9am to 6pm. Although Father is looking for a job where he can make the same amount of money and work less hours, he has not taken any steps towards finding employment which would allow him to successfully parent the [C]hildren without Mother until she is able to safely be in the home with the [C]hildren.

42. Father has acknowledged being domestically violent towards Mother and has only completed five out of twenty-six recommended classes towards this service. This referral was made at the recommendation of Mother and Father's service providers.

43. Father participated in home-based therapy but has not been successfully discharged.

44. Father did not participate in Father's Engagement.

\* \* \*

60. When asked about what treatments the [C]hildren needed, . . . [P]arents were largely unable to articulate the services which [S.A.] and [E.S.] need, and do not have a plan for how they will manage the extensive transportation and time requirements needed to ensure the [C]hildren make these appointments.

\* \* \*

62. The FCM testified that the [C]hildren are placed in pre-adoptive foster homes. . . .

63. The [C]hildren's [GAL] recommends the court grant the DCS's Petition for Involuntary Termination and believes that to be in [the Children's] best interest.

64. The totality of evidence in this case demonstrates, among other significant issues such as the [C]hildren's medical needs, a codependent, controlling and sometimes violent relationship between the [P]arents, and a failure to complete court ordered services that [M]other is either unable or unwilling to address her substance abuse issues. It further demonstrates Father is either unable or unwilling to take the steps necessary to ensure he can provide the [C]hildren with a safe home free from substance abuse.

* * *

66. Mother's failure to attend and complete substance abuse treatment, despite numerous opportunities to do so reflects a choice that Mother has repeatedly made to mitigate her own discomfort in group sessions rather than to provide a safe and stable environment for [C]hildren free from substance abuse. . . .

67. Mother's current engagement with a treatment program has not proven effective as she continues to use illicit substances and would test positive for illicit substances such as pain pills if tested the day of trial. Mother has missed multiple meetings and appointments with her current treatment provider. This reinforces a seeming lack of motivation or interest in maintaining sobriety.

* * *

Appealed Order at 3-6.[4] Based on these findings, the juvenile court concluded there is a reasonable probability that the conditions that led to Children's removal and continued placement outside the home would not be remedied and continuation of the parent-child relationship poses a threat to Children's well-being. *See id*. at 7-8, ¶¶ 75-76. The juvenile court also concluded that termination of Parents' parental rights is in the Children's best interests and adoption is a satisfactory plan. *See id.* at 8, ¶¶ 77-78. Mother and Father now separately appeal. Additional facts pertinent to each parent will be supplied in the analysis of their respective appeals as necessary.[5]

# Discussion and Decision

## I. Standard of Review

The Fourteenth Amendment to the United States Constitution protects a parent's right to raise his or her children. *In re D.D.*, 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), *trans. denied*. Although "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests[,]'" parental interests are not absolute and "must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Bester v. Lake Cty. Office of Family &*

---

[4] Our citation to the appealed order is based on the .pdf pagination.

[5] We note that the State's brief provides a witness by witness summary of the testimony at the TPR hearing which is prohibited by the Indiana Rules of Appellate Procedure. *See* Ind. Appellate Rule 46(A)(6)(c).

*Children*, 839 N.E.2d 143, 147 (Ind. 2005) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Thus, the parent-child relationship may be terminated when a parent is unable or unwilling to meet their parental obligations. *Id.* We are cognizant that involuntary termination of parental rights is the most severe sanction a court can impose because it severs all rights of a parent to his or her child. *Matter of D.G.*, 702 N.E.2d 777, 780-81 (Ind. Ct. App. 1998). Therefore, termination is considered a last resort, "available only when all other reasonable efforts have failed." *Id.* at 781.

[14] Given the juvenile court's unique position, we review the termination of parental rights with great deference. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013). We do not reweigh the evidence or judge the credibility of the witnesses. *Bester*, 839 N.E.2d at 147. Instead, we consider the evidence and reasonable inferences most favorable to the juvenile court's judgment. *Id.* We will set aside the juvenile court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied*, 534 U.S. 1161 (2002). Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[15] The juvenile court's judgment contains specific findings of fact and conclusions thereon as required by Indiana Code section 31-35-2-8(c). Therefore, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings, then whether the findings support the judgment. *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015). "Findings are clearly erroneous only when the record contains no facts to support them either directly or by

inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id*.

## II. Requirements for Termination

To terminate the parent-child relationship, DCS must prove by clear and convincing evidence:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> * * *
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2); *see also* Ind. Code § 31-37-14-2 ("A finding in a proceeding to terminate parental rights must be based upon clear and convincing evidence.") "[I]f the court finds that the allegations in a petition

described [above] are true, the court *shall* terminate the parent-child relationship." Ind. Code § 31-35-2-8(a) (emphasis added). Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the juvenile court is only required to find that one of the elements of subsection (b)(2)(B) was established by clear and convincing evidence. *In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009).

# III. Father's Appeal

## A. Findings of Fact

[17] Father challenges six of the juvenile court's findings of fact as unsupported by the evidence. As noted above, findings are clearly erroneous if the record contains no evidence to support them either directly or by inference. *In re S.S.*, 120 N.E.3d 605, 609 (Ind. Ct. App. 2019). Father challenges only six findings; we accept the remaining findings as true. *Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992).

[18] First, Father challenges finding thirty-nine:

> 39. If the [C]hildren were returned to Father, the only way for their parental obligations to be met would be for Mother to be alone with the [C]hildren a significant amount of the time.

Father contends this finding is unsupported by the evidence because he testified he would "be able to place the Children in day care while he is at work[.]" Brief of [Father] ("Father's Br.") at 29; *see also* Tr., Vol. II at 157. He also notes Children will be required to attend school during weekdays and he will not

need childcare during those hours. He therefore argues there would be no particular need for Children to be left alone in Mother's care while he is at work. However, prior to the Children's removal, Father worked 9 a.m. to 6 p.m. six days a week and struggled to take care of Children, especially for an hour at the end of each workday, hours during which Children are not in school. Rather than place Children in daycare when the juvenile court allowed Children to be placed with him shortly after the CHINS proceedings began, however, Father requested permission for Mother to watch the Children unsupervised while he worked even though she had documented substance abuse issues. Father testified at the termination hearing that at the outset of this case, he could not care for Children and keep his job without Mother's help. *See* Tr., Vol. II at 36. Although he testified he was now willing to care for Children alone and said he had a plan to do so, he did not present any evidence to the juvenile court that he had taken concrete steps to implement that plan. Rather, he testified that he had only "been thinking about making a change [in his job] for at least a month[,]" despite having nearly two years to address the issue. *Id.* at 158. Moreover, he was "just starting to look into" daycare. *Id.* at 157. There is ample evidence in the record from which a reasonable inference could be made that Father cannot care for Children without Mother's help. Therefore, finding thirty-nine is not clearly erroneous.

[19] Father also challenges finding forty-one:

> 41. Father's current job requires him to work six days a week from 9am to 6pm. Although Father is looking for a job where he

can make the same amount of money and work less hours, he has not taken any steps towards finding employment which would allow him to successfully parent the [C]hildren without Mother until she is able to safely be in the home with the [C]hildren.

Father argues that the evidence shows he *has* taken steps to obtain a position with a different work schedule. He also argues that he cannot be expected to change jobs without knowing when Children will be coming back to his care. As noted above, the record shows that at the time of the termination hearing, Father still had the same job with the same hours that resulted in him needing Mother's assistance to care for Children at the beginning of the CHINS proceedings. Almost two years later, Father *began* thinking about changing employment, and a week before the termination hearing, he *heard* about a job at which he could work fewer hours, on fewer days, for the same amount of money. However, he had not even had an interview for this new position, let alone been hired. As for not changing jobs until he knew Children would be returned to his care, there needed to be evidence that Father *could* care for Children alone if they were returned to his care. Maintaining the same schedule for the entirety of this case does not demonstrate his ability or willingness to do so. We conclude there is evidence to support finding forty-one.

[20]   Next, Father contends finding forty-two is unsupported by the evidence:

42. Father has acknowledged being domestically violent towards Mother and has only completed five out of twenty-six recommended classes towards his service. This referral was made at the recommendation of Mother and Father's service providers.

Father contends this finding is clearly erroneous because although Father admitted to one incident of domestic violence, Parents denied any *other* incidents and he was actively participating in domestic violence classes at the time of the termination hearing. Father admitted at the termination hearing, and in his brief, that he pushed Mother, which resulted in her sustaining bruises and a black eye. *See id*. at 46; *see also* Father's Br. at 30. In addition to that admission, however, service providers also noticed that Mother "visibly would have bruises and things like that," Tr., Vol. II at 51, and noted that Father's controlling behavior was of concern, *see id.* at 52 (Mother's therapist testifying that Father would cancel Mother's appointments) and 93 (Mother's home-based case manager testifying that Father would often have both his and Mother's cellphones). This evidence indicates there was a greater concern than a single incident. Father also stated at the termination hearing that he only completed five of twenty-six domestic violence classes, which is consistent with the juvenile court's finding. Although Father is correct that finding forty-two does not acknowledge that he had only completed five classes because the referral came late in the process and the classes are ongoing, this finding is nonetheless supported by the evidence and is not clearly erroneous.

[21]     Father also challenges finding forty-three:

> 43. Father participated in home-based therapy but has not been successfully discharged.

At the termination hearing, FCM Seleste Fielder testified that Father was engaged in home-based therapy, but he has not been successfully discharged.

Father simply argues that it is "difficult to conceive" how he could successfully complete this service while Children remain in foster care. Father's Br. at 30. However, it appears he *is* participating in therapy weekly. *See* Tr., Vol. II at 44 (Father testifying that he participates in therapy every week). Thus, although the finding is perhaps worded poorly because it does not reflect that Father has not been successfully discharged because therapy is ongoing, it does impart that Father's therapist believes he is still in need of therapy. Thus, the evidence in the record is consistent with the juvenile court's finding and it is not clearly erroneous.

[22] Father argues finding forty-four is not supported by the evidence:

> 44. Father did not participate in Father's Engagement.

Father maintains that this finding is clearly erroneous because he *did* participate in the Father Engagement Program for several weeks. Father also argues it is not possible to complete the program when the Children are not in his custody. Father testified at the termination hearing that he participated in the program for four weeks until his employment conflicted with the program. Thus, although a reasonable interpretation of the juvenile court's finding based on inferences from the evidence is that Father did not fully participate and *complete* the program, the finding is technically incorrect. However, the inclusion of this finding is harmless error. When an erroneous finding is "not of such magnitude that it calls into question the court's conclusion" when considered in conjunction with the other evidence presented and findings made, we will not

reverse. *Matter of A.C.B.*, 598 N.E.2d 570, 573 (Ind. Ct. App. 1992); *see also In re B.J.*, 879 N.E.2d 7, 19 (Ind. Ct. App. 2008) (affirming termination of parental rights despite erroneous finding based on testimony stricken from the record because the error did not "constitute the sole support for any conclusion of law necessary to sustain the judgment"), *trans. denied.* This erroneous finding does not directly and solely support a conclusion necessary to sustain the judgment and therefore, it is at most harmless error.

[23]  Finally, Father challenges finding sixty:

> 60. When asked about what treatments the [C]hildren needed, either in terms of [K.A.] and [A.A.]'s therapy or [E.S.] and [S.A.]'s medical needs, parents were largely unable to articulate the services which [S.A.] and [E.S.] need, and do not have a plan for how they will manage the extensive transportation and time requirements needed to ensure the [C]hildren make these appointments.

Father argues that this finding is unsupported by the evidence because Parents provided care and transportation for Children prior to their removal and they were unaware of Children's medical conditions only because they were unable to visit with them and were not given specific details by service providers. At the termination hearing, Father answered affirmatively when asked whether he was aware of any specific medical needs that any of the Children have. *See id.* at 37. But he was only able to articulate that E.S. has autism and S.A. needs therapies. The record reveals that Father attended only one of E.S.'s numerous therapy sessions. Further, Father stated that he would be able to take Children

to their appointments *when* he found a part-time job. However, at the fact-finding hearing, Father testified that he was looking for part-time employment but offered no evidence that he had secured such employment or had taken any steps toward achieving this goal. *See id*. at 156-57. Because the evidence establishes that Father was not aware of Children's many medical conditions and required treatments and that he failed to obtain more flexible employment which would allow him to transport the Children to their many appointments, we conclude there is evidence in the record to support this finding.

[24] In essence, Father's arguments are all requests for this court to reweigh the evidence, which we will not do. *See Bester*, 839 N.E.2d at 147. We conclude there is evidence in the record to support most of the challenged findings and, to the extent finding forty-four is clearly erroneous, the error does not call into question the juvenile court's conclusion given the substantial evidence supporting termination of Father's parental rights. Therefore, we find no error.

## B.  Conclusions of Law

### *1.  Remedy of Conditions Resulting in Removal*

[25] The juvenile court concluded there is a reasonable probability that the conditions resulting in Children's removal and continued placement outside the home will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B). Father challenges the juvenile court's conclusion and argues that the evidence does not "clearly and convincingly" show that the conditions will not be remedied. Father's Br. at 32.

[26] In determining whether the conditions that led to removal are likely to be remedied, we engage in a two-step analysis: we first identify the conditions that led to Children's removal, and then determine whether there is a reasonable probability that those conditions will not be remedied. *K.E.*, 39 N.E.3d at 647. The second step requires the juvenile court to evaluate a parent's fitness to care for a child at the time of the termination hearing and consider a parent's pattern of conduct to determine whether there is a "substantial probability of future neglect or deprivation of the children." *In re T.F.*, 743 N.E.2d 766, 774 (Ind. Ct. App. 2001), *trans. denied*. When evaluating a parent's fitness, the juvenile court may properly consider a parent's criminal history, substance abuse issues, history of neglect, failure to provide support, lack of adequate housing and employment, and services offered by DCS to a parent and the parent's response to those services. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. Moreover, this court has held that a pattern of unwillingness to deal with parenting problems and to cooperate with counselors and those providing services, in conjunction with unchanged and unacceptable home conditions, supports a finding that there is no reasonable probability the unacceptable conditions in the home will be remedied. *Matter of D.B.*, 561 N.E.2d 844, 848 (Ind. Ct. App. 1990).

[27] The record reveals that Children were initially removed from Parents' care due to Mother's substance abuse problems. Children were briefly returned to Father's care but the juvenile court ultimately ordered the Children to be

removed from Father's care and remain out of his care due to his inability to care for Children without Mother's assistance in their home.

[28] The record supports the conclusion that there is a reasonable probability that the conditions that led to Children's removal and continued placement outside of Father's care would not be remedied. Mother has failed to address or remedy her substance abuse issues. When asked to submit to a drug screen the day of the fact-finding hearing, Mother indicated she would test positive for illicit substances. Although Mother participated in some services, the evidence demonstrates that Father hindered Mother's participation by interfering with those services, preventing Mother from making progress and remedying her substance abuse.

[29] At the fact-finding hearing, Mother's home-based case manager Sherika Sultzer testified that Mother was inconsistent with services and would not be heard from for "about three or four weeks[.]" *Id*. at 74. She testified that Father cancelled a lot of Mother's appointments and Mother was unaware of it. Sultzer opined that Father was not supportive of Mother's significant need in obtaining treatments. Furthermore, Father would ignore Mother's substance abuse issues and pretend they were not an issue. FCM Fielder testified that Father "would act like he didn't know [Mother] was using[.]" *Id*. at 122.

[30] As such, there is a reasonable probability that the conditions for Children's continued placement outside of Father's care, namely Mother's presence in the home and Father's inability to independently care for the Children, will not be

remedied. As previously noted, Father's current work schedule prevents him from being able to independently care for Children and although he may intend to obtain flexible employment, he has not done so. At the fact-finding hearing, Father admitted that at the outset of this case, he was not able to care for Children and have his job at the same time without Mother's assistance. *See* Tr., Vol. II at 36. Although he indicated at the termination hearing that he would be able to care for them on his own, he offered no evidence that his circumstances had changed since the Children were removed. Therefore, there is no question that Father cannot care for Children without the assistance of Mother, inevitably exposing Children to her substance abuse and related issues. And Father testified that "[t]here's been a few times [he]'s asked [Mother] to leave [the home], but [they] would work through it" and it was his intention to continue to work on his relationship with Mother. *Id.* at 39. Therefore, there is a reasonable probability that Mother's presence in the home and Father's reliance on Mother for childcare will continue.

[31] Although Father is well-aware of Mother's struggle with substance abuse, he has chosen to remain ignorant of the problem and its effect on Children. Instead, not only does Father refuse to make any changes to remedy the conditions preventing his Children from safely returning to his care, such as obtaining flexible employment, he has actively prevented it by interfering with Mother's services. Father has demonstrated an unwillingness to remedy Mother's substance abuse issues inside the home through a pattern of interfering with Mother's participation and progress in services. Therefore, we

conclude that DCS proved by clear and convincing evidence that there was a reasonable probability that the conditions resulting in Children's removal and continued placement outside of Father's care would not be remedied.[6]

## 2. Best Interests of Children

[32]     Father also challenges the juvenile court's conclusion that termination of his parental rights is in Children's best interests. In determining the best interests of a child, the juvenile court must "look beyond the factors identified by the DCS and look to the totality of the evidence." *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). In doing so, the court must subordinate the interest of the parent to those of the child. *A.D.S.*, 987 N.E.2d at 1158. A juvenile court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). "A child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the child's guardian ad litem supports a finding that termination is in the child's best interests." *In re D.L.*, 814 N.E.2d 1022, 1030 (Ind. Ct. App. 2004), *trans. denied*.

---

[6] The juvenile court also concluded that continuation of the parent-child relationship poses a threat to the Children's well-being. Father challenges this conclusion, but because we have concluded that DCS met its burden of showing there was a reasonable probability that the conditions resulting in removal would not be remedied, and because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, we need not address whether the parent-child relationship poses a threat to Children's well-being. *See I.A.*, 903 N.E.2d at 153.

At the fact-finding hearing, the GAL testified that she believed it was in the Children's best interests for Parents' parental rights to be terminated. She testified that adoption would provide Children with permanency and that Children have stability in their current placements. *See* Tr., Vol. II at 141. FCM Fielder also testified that termination of Mother's and Father's parental rights is in Children's best interests because Parents "are not able to provide for [Children] at this time. They haven't completed any of their treatment goals, the main one for [Mother] is the substance abuse." *Id*. at 128.

We have previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *A.D.S.*, 987 N.E.2d at 1158-59. Here, the FCM and GAL both testified that termination of Parents' parental rights is in Children's best interests. Given this evidence, the juvenile court did not err in concluding that termination of Parents' parental rights is in Children's best interests.

### 3. Satisfactory Plan

Finally, Father challenges the juvenile court's conclusion that adoption by Children's current placement is a satisfactory plan. He argues that "leaving his Children divided between three adoptive placements cannot be considered a 'satisfactory plan[.]'" Father's Br. at 38. A DCS plan is satisfactory when the plan is to attempt to find suitable parents to adopt the children. *A.S.*, 17 N.E.3d at 1007. The plan need not be detailed, so long as it offers a general sense of the

direction the child will go after the parent-child relationship is terminated. *A.J. v. Marion Cty. Office of Family & Children*, 881 N.E.2d 706, 719 (Ind. Ct. App. 2008), *trans. denied*.

[36]  Here, DCS's plan for each of Children is adoption by their current foster parents. Although Children are currently in three different foster homes, placement in separate adoptive homes does not render a plan unsatisfactory. *See A.S.*, 17 N.E.3d at 1007 (noting that a plan is satisfactory even if the plan is for the children to have separate adoptive homes), *trans. denied*. Thus, the evidence supports the juvenile court's determination that adoption by Children's current foster parents is a satisfactory plan.

[37]  DCS proved by clear and convincing evidence each element required by Indiana Code section 31-35-2-4(b); therefore, the juvenile court's judgment terminating Father's parental rights is not clearly erroneous.

# IV.  Mother's Appeal

[38]  We note that Mother does not challenge any of the juvenile court's specific findings, and those unchallenged findings are accepted as true. *McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997). Mother argues that DCS did not present sufficient evidence to terminate her parental rights because she did not have a fair opportunity to engage in services as a result of her anxiety. *See* Brief of Appellant [Mother] at 24. She maintains that DCS should have allowed her additional time to work on managing her mental health so she could be able to successfully complete services, which may have saved her

relationship with Children. In essence, Mother argues that DCS did not prove there is a reasonable probability that the conditions leading to Children's removal will not be remedied.[7] As noted above, we engage in a two-step analysis to determine whether the conditions that led to removal are likely to be remedied: we first identify the conditions that led to Children's removal, and then determine whether there is a reasonable probability that those conditions will not be remedied. *K.E.*, 39 N.E.3d at 647.

[39] Here, Children were removed from Mother's care due to her ongoing substance abuse. The trial court found that Mother failed to complete services and failed to address her substance abuse issues. During the CHINS proceeding, the juvenile court ordered Mother to engage in home-based therapy, complete home-based case management, submit to drug screens, and successfully complete a substance abuse assessment. Mother's home-based therapist, Felix McGee, testified that he and Mother worked on her anxiety and she made the most progress in that area. But Mother had not accomplished the goal of sober living and therefore he could not recommend Children be returned to her care. Although Mother completed three substance abuse assessments, she was never able to complete the recommended substance abuse treatment. Sultzer testified that Mother was looking for substance abuse treatment that is "not really available" – one-on-one outpatient treatment. Tr., Vol. II at 77. Mother did not

---

[7] Mother does not challenge the trial court's conclusions regarding the threat to Children's well-being, the best interests of Children, or the plan for Children's care and treatment.

successfully complete any case management goals and was discharged unsuccessfully for lack of communication. In addition, Mother often failed to engage in drug screens and when asked to, she would concede that a test would be positive for drug use. In fact, Mother testified at the termination hearing that she would test positive for illicit substances if tested that day. All of Mother's service providers indicated an awareness of her anxiety and demonstrated efforts to accommodate or overcome the limitations her anxiety placed on her participation. Nonetheless, Mother did not show any progress in addressing the reason Children were removed: her substance abuse.

[40] DCS is generally required to make reasonable efforts to preserve and reunify families; however, failure to provide services does not negate a necessary element of the termination statute and require reversal. *In re E.E.*, 736 N.E.2d 791, 796 (Ind. Ct. App. 2000). Mother's argument is simply a request for this court to reweigh the evidence, which is the province of the juvenile court, not this court. *See Bester*, 839 N.E.2d at 147. We have often noted that evidence of a parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services demonstrates the requisite reasonable probability that the conditions will not change. *See, e.g., Lang v. Starke Cty. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. Such is the case here.

[41] DCS offered Mother several opportunities to participate in services to address her anxiety and obtain sobriety. Substance abuse is the underlying issue for Mother, and she has failed to complete substance abuse programs and additional services offered despite being counseled to participate for over two

years. Rather than doing what is necessary to provide a safe and stable environment for Children free of substance abuse, Mother has continued to voluntarily abuse substances and not engage fully with services available to assist her. Because the juvenile court's unchallenged findings clearly and convincingly support its ultimate decision to terminate Mother's parental rights to Children, we conclude the juvenile court's order is not clearly erroneous. *See, e.g., In re E.M.*, 4 N.E.3d at 644 (findings regarding a parent's continued non-compliance with services supported juvenile court's conclusion the conditions under which children were removed from the parent's care would not be remedied).

# Conclusion

[42] We conclude that DCS presented sufficient evidence to support the juvenile court's determination to terminate Mother's and Father's parental rights to Children and thus, the judgment of the juvenile court is not clearly erroneous. Accordingly, we affirm.

[43] Affirmed.

Bradford, C.J., and Altice, J., concur.